# 14-1615-CV

## United States Court of Appeals

*for the*

## Second Circuit

S.F., as Parent and Natural Guardian of S.E.F., an infant,

*Plaintiff-Appellant,*

– v. –

ARCHER DANIELS MIDLAND COMPANY, CARGILL INC., INGREDION INC., TATE & LYLE INGREDIENTS AMERICAS, LLC, ROQUETTE AMERICA INC.,

*Defendants-Appellees,*

PENFORD PRODUCTS CORPORATION,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

LAW OFFICE OF J. MICHAEL HAYES
69 Delaware Avenue, Suite 1111
Buffalo, New York 14202
(716) 852-1111

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF SUBJECT MATTER
ANDAPPELLATE JURISDICTION ............................................................. 1

STATEMENT OF THE STANDARD OF REVIEW ................................... 1

ISSUES RAISED ON APPEAL ................................................................... 2

STATEMENT OF FACTS...............................................................................5
   Background...................................................................................5
   Inconsistent Positions by the District Court..............................7
   Chemistry, Science and Research ...........................................8
   Fructose .....................................................................................10

POINT I
   THE CAUSES OF TYPE 2 DIABETES ARE
   NOT A MATTER OF COMMON SENSE............................11
      Judicial Notice.............................................................11
      Race.............................................................................13
      Lack of Exercise.........................................................13
      Obesity........................................................................14
      Poor Diet......................................................................14

POINT II
   PRODUCT LIABILITY ........................................................ 17
      Wrong Legal Standard Cited by Court................................... 17
      "Not Reasonably Safe" Standard ........................................... 18
      Failure to Warn....................................................................... 19

POINT III
   MARKET SHARE LIABILITY ....................................................... 24

POINT IV.......................................................................................... 29

CONCLUSION ................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007) ......... 3

*Bremer v. Amer. Cyanamid Co.*, 263 AD2d 165,
    699 NYS2d 848 (4th Dept., 1999)..................................................... 26

*Ford v. D.C. 37 Union Local 1549,* 579 F.3d 187 (2d Cir., 2009)………1

*Hamilton v. Beretta USA Corp.*, 96 NY2d 222,
    727 NYS2d 7 (2001) ................................................................... 5, 28

*Haran by Haran v. Union Carbide Corp.*, 68 N.Y. 2d 710,
    506 N.Y.S.2d 311 (PJI 2:120, Vol. 1A p. 744, 2014) ..................... 17

*Hymowitz v. Eli Lilly and Co.*, 73 NY2d 487 (1989) ........................5, 24-27

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir., 2005) .....................................................15-16

*Pom Wonderful LLC v. Coca-Cola Co.,* ____ U.S. ____,
    decided June 12, 2014 ................................................................ 21, 29

*Ragin v. New York Times Co.*, 923 F.2d 995 (1991) ..................................... 1

*Rastelli v. Goodyear Tire & Rubber Co.,* 79 NY2d 289 (1992) ................... 4

## TREATESES

*New York Pattern Jury Instructions,* 201 § 2:120 ............................17, 22-23

*Prosser on Torts* ........................................................................................ 15

*Time Magazine,* June 23, 2014, p. 30-35 ...................................................... 6

## REGULATIONS

*Fed. R. Civ. P. 8(a)* ................................................................................. 16

*Fed. R. Civ. P. 12(b)(6)*............................................................................. 1

*General Business Law §349*...............................................................15-16

*28 U.S.C. § 1291* ....................................................................................... 1

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is a diversity action, 28 USC §1331, in which S.F., as Parent and Natural Guardian of S.E.F., an Infant, presented a common law tort claim in product liability and failure to warn against several foreign corporations.

This appeal, filed on May 7, 2014,  is from a final Order of the District Court on April 21, 2014 granting Motions to Dismiss (MTD) the Amended Complaint by Defendants Archer-Daniels Midland Company, Cargill, Inc., Ingredion, Inc., Tate & Lyle Ingredients Americas, LLC and Roquette America, Inc. under *Fed. R. Civ. P. 12(b)(6)*.  This Court has jurisdiction to review final Orders of the District Court pursuant to *28 U.S.C. § 1291*.

## STATEMENT OF THE STANDARD OF REVIEW

This Court, pursuant to *28 U.S.C. § 1291*, exercises plenary review over final Orders of the District Court including the entry of an Order dismissing a Complaint under *Fed. R. Civ. P. 12(b)(6)*.  The standard upon such a motion is that the burden is upon the moving parties, the Defendants, to demonstrate that the complaint totally fails to state any causes of action where all factual allegations in the Complaint are deemed to be accepted as true.  *Ragin v. New York Times Co.* 923 F.2d 995 (1991); *Ford v. D.C. 37 Union Local 1549,* 579 F.3d 187 (2d Cir., 2009)

1

S.E.F believes that oral argument is very appropriate and would be helpful due to the apparent conflicted interpretations of science, fact, evidence and fiction together with important questions regarding the necessary levels of proof in pleadings of tort claims, products liability and failure to warn, specifically. Oral argument would be helpful on the specific issue of the scientific evidence before the Court, especially where the District Court dismissed science entirely and instead relied upon "common sense." Oral argument will also be helpful in discussing the application of Market Share liability, an infrequent form of claim allocation, about which there appears to be differing interpretations.

### ISSUES RAISED ON APPEAL

I.     Issue:   *Is Type 2 diabetes "caused by a lack of exercise, genetics or poor diet – or some combination of several factors?" (SPA-7)*

Answer of the Court below:  Yes, because "no expert opinion is required to arrive at this conclusion." It is a matter of "common sense." (SPA-7)

Standard of Review:  The facts alleged by plaintiff are to be assumed true and, where the district court instead assumes facts neither pled, proven or even scientifically referenced, then this court may review the matter *de novo*.

2

II.    Issue:  *Is a Complaint properly dismissed just because the Court feels that the claims are not "plausible," even though the leading medical expert in the field references numerous supporting peer reviewed studies, swears under oath that the use of the product HFCS was, in this case, with reasonable medical and scientific certainty, a cause, that is a significant factor, in the infant plaintiff developing the disease?*

Answer of the Court below:  Yes.

Standard of Review:    A District Court may not arbitrarily substitute its "beliefs" over scientifically attested facts and referenced peer reviewed research and dismiss a claim simply because the trial Judge disbelieves all allegations or feels that recovery is remote or unlikely.  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1995 (2007)

III.    Issue:  *Is it the law in products liability that a totally man-made, artificial substance must be shown to be "unreasonably dangerous," and is the test that the substance need only be "similar" to a naturally occurring product to be excluded from scrutiny?*

3

Answer of the Court below:  Yes.  Though "this court is not in a position to make findings of fact on the hotly debated health effects of sugar and high-fructose corn syrup" and though fructose in sugar at a constant dose of 50% versus the concentrated doses in HFCS ranging from 55% to 99.9%, the Court found that there is no difference between the two substances as a matter of law.

Standard of Review:  The standard for products liability is "not reasonably safe,"  "Unreasonably dangerous" is not the standard and is error.  Furthermore, the two substances are admittedly different and any such questions should be for jury evaluation.

IV.  Issue:  *Under product liability/failure to warn theories, where a sound product is combined with a dangerous product, does the manufacturer of the dangerous product have a duty to warn of the dangers inherent therein.*

Answer of the Court below:  No.

Standard of Review:  This Court is empowered to review and apply the actual law *de novo*.  *Rastelli v. Goodyear Tire & Rubber Co.,* 79 NY2d 289 (1992).

V.   Issue:   *Is Market Share liability a theory that only applies in the DES cases and none others?*

Answer of the Court below:     Yes.

Standard of Review:   The District Court totally misread and misapplied the scope, holding and application of Market Share as set forth in *Hymowitz v. Eli Lilly & Co., 73 NY 2d 487 (1989)* and *Hamilton v. Beretta USA Corp., 96 NY 2d 222 (2001)*.

## STATEMENT OF FACTS

### Background

Infant Plaintiff S.E.F. ate substantial quantities of food containing High Fructose Corn Syrup, (hereinafter "HFCS") over the course of her lifetime. She developed type 2 diabetes at age 12. Plaintiff's expert, Robert Lustig, M.D., opined with reasonable medical and scientific certainty, that Plaintiff's disease, was in substantial part, caused by her long term consumption of that substance.

The commercial marketing of the totally man-made product, High Fructose Corn Syrup, began in the 1970s (A-179). HFCS was presented to the FDA in 1983 as the "functional equivalent" of sugar. GRAS designation by the FDA was issued upon that basis (A-181). The FDA did not consider any concentrations of HFCS beyond 42% and 55%. (A-306-307)

5

The HFCS industry has actively promoted the position that HFCS and sugar (sucrose) are the "same" for over two generations (A-184) and recently expended over $30 million on a campaign to advertise that falsehood (A-185).  Since HFCS has been introduced and accepted into mainstream processed food, type 2 diabetes, formerly unheard of in children, has skyrocketed to an estimated 40,000. (A-446) Scientific knowledge and reality have begun to catch up to the industry's misinformation.  *Time Magazine*, June 23, 2014, p. 30-35.

Outsiders have rarely, if ever, investigated or reviewed the HFCS industry's internal documents or research such that it is not known what the industry may or may not have been known regarding the long term effect of its creation.  The tidal shift to the use of HFCS came about in significant part due to reaction to the now totally debunked *Seven Counties Study* by Ancel Keys 40 years ago.[1]  Independent researchers are finally conducting and publishing research that is neither sponsored, supported nor screened by the HFCS manufacturers and the processed food industry.  Until very recently, for all practical purposes, studies were paid for and/or sponsored by the processed food industry.  The house of cards that the defendant chemical companies have constructed and their, to date, total freedom from scrutiny, is dependent upon the false "belief" that HFCS and sugar are the

---

[1]    *Time Magazine*, June 23, 2014, p. 30-35.   "He [Keys] cherry picked his data.  It was highly flawed" says Dr. Peter Attia.  p.32

6

same. Certainly, the lower court accepted that proposition and considered it a *sine qua non*. (SAP-13)

### Inconsistent Positions by the District Court

As is referenced in the Complaint, however, science and research have clearly established a significant causal link between HFCS, metabolic syndrome and type 2 diabetes. (A-140-144, A-145-150, A-180-183, A-208) Plaintiff's expert, Robert Lustig, M.D., and the Complaint, go into significant scientific detail regarding the physiological effects and consequences of excessive fructose consumption on the body generally and on the infant Plaintiff S.E.F. specifically. (A-180-183, A203) These conclusions and scientific assertions are supported by peer reviewed scientific studies in the record which addresses the physiology and directly demonstrated that "fructose . . . promotes . . . the development of insulin resistance." (A-79) Furthermore, tests conducted with sugar versus HFCS 55, (argued to be functional equivalents) have been shown to have actually different effects on test subjects, including "diminished glucose tolerance and insulin sensitivity." (A-79)

Ironically, the District Court acknowledged that the record does include evidence favorable to Plaintiff when it observes that "there is considerable evidence of a detrimental effect on metabolic health of excess fructose consumption" and that "over consumption of HFCS could very well be a major

7

factor in the 'obesity epidemic' because fructose is processed differently than sucrose." (SPA-13)    However, the District Court then ignored all the empirical evidence it just recognized with the dismissive comment that "no expert opinion is required" to arrive at the conclusion with respect to the causes of type 2 diabetes. (SPA-7)    Furthermore, "if there is no difference between HFCS and simple fructose [*sic* sucrose/sugar], HFCS can hardly be said to be unreasonably dangerous."  This latter conclusion, of course, is the one that has been promoted by the HFCS industry since its GRAS application, wherein it stated that, "the glucose to fructose ratio of HFCS is approximately the same as that of honey, invert sugar and sucrose." (A-48)

## Chemistry, Science and Research

The claim that sugar and HFCS are the same substance is false and has never been scientifically established.  This is clearly demonstrated in the Record.  In its most basic form, the substances are different compounds that do not even have the same molecular compositions.  Chemically, sucrose has the formula $C_{12}H_{22}O_{11}$, whereas High Fructose Corn Syrup is $C_8H_{12}O_8$. (A-112)  Those scientific facts are contained in an affidavit of an expert, Dr. John S. White, submitted in 1997 in a different action by Defendants themselves.   Dr. White distinguishes the two substances that presumably are the 42% and 55% concentrations.   Chemically speaking, he notes that:

8

It is the presence or absence of the covalent chemical bond between fructose and dextrose which defines the specific physical and functional characteristics of sucrose [sugar] and HFCS, respectively. *These characteristics dictate, in turn, the very different roles each sweetener plays in food products*." [A-112] (emphasis added).

The District Court's conclusion that "there is no difference between HFCS and simple fructose [*sic*]" (SPA-7), is simplistically naïve. This is especially so when considered in light of the evidence before the Court generally and Dr. White's affidavit specifically. In fact, Defendants' expert, Dr. White, further describes differences between the two substances which:

> Manifest themselves in unique physical characteristics like melting/decomposition temperature, chemical reducing ability, specific notation, sweetness intensity, solubility, humectancy and hydroscopicity, the ability to control or prevent water from freezing and colligative properties like freezing point depression, osmotic pressure and water activity. [A-113]

Emphasizing and expanding upon that summary, Dr. White goes on to explain in his affidavit that one of the major distinguishing features between the two substances is their "sweetness." HFCS, even at the lower 42% & 55% level (and not even considering the HFS 65%, 90%, and 99.9%), yields the perception of sweetness more quickly and acutely than with sugar. (A-116) In other words, HFCS is sweeter than sugar. Furthermore, "food formulators [and obviously the HFCS manufacturers] know that certain flavors are more pronounced when sweetened with HFCS than sucrose." (A-116)

9

The obvious and significant point is that "food formulators" consider, when designing their colas, power bars, breads, candy bars, pizza crusts, jellies and ice creams that HFCS is perceived by our bodies to be sweeter than sugar. That factor HFCS manufacturers know will induce certain groups of consumers, particularly infants and teenagers, to choose its product containing HFCS over one containing conventional sugar.

Dr. White goes over many other differences and distinctions between the two products in detail at A-116 to A-118. He concludes with the observation that:

> Food formulation scientists are well-schooled in the strengths and weaknesses of each sweetener . . . sucrose and HFCS occupy unique niches within these products. . . it is a rare application indeed when one sweetener can directly replace the other with no loss in functionality or product quality.

For example, HFCS does not linger as long on the tongue as sugar such that one must consume more to maintain the same intense level of sweetness. (A-116)

The District Court's simplistic conclusion that "there is no difference between HFCS and simple fructose [*sic*]" is totally superficial and inaccurate.

**Fructose**

Though distinctions have been highlighted by a defense expert, Plaintiff concedes that the two substances do have similarities. What is of importance to this discussion, and was emphasized by the lower court, is the fact that both substances contain "fructose."

10

Fructose is a substance that occurs in nature, always in equal (50/50%) percentages with glucose. Artificial fructose can be and is chemically manufactured by Defendants at levels impossible to find in nature. Fructose 90% is the product invented in the 1960s for which marketing began commercially in the 1970s. HFCS 90% is the product. It is sometimes diluted by the manufacturer to lower percentages and sold to food manufacturers/food formulators. GRAS recognition was accorded by the FDA only for HFCS 42% and HFCS 55% and only upon the undocumented assumption that it was "the functional equivalent of sugar."

The District Court, and presumably the public generally, have been convinced that the two products – natural sugar and HFCS, and the fructose contained in each, are "essentially" the same and "functional equivalent" despite untested (or unpublished) differences at concentration levels of 55%, 64%, 90% and 99.9%.

## POINT I

### THE CAUSES OF TYPE 2 DIABETES ARE NOT A MATTER OF "COMMON SENSE"

#### Judicial Notice

One of the most egregious errors in the entire decision is the District Court presuming to take judicial notice of the causes of type 2 diabetes.

11

> Type 2 diabetes is a multifactorial disease.  It can be
> caused, for example, by a lack of exercise, genetics, or
> poor diet – or some combination of several factors.  No
> expert opinion is required to arrive at this conclusion.
> (SPA-7)

There were no peer reviewed studies or scientific literature cited that support that

conclusion and the evidence in the Record and in the Complaint is to the contrary.

There were no affidavits or scientific papers either submitted or even referenced to

support this proposition.  Rather, the conclusion of the District Court appears to

have been lifted from an argument made in Defendant's Memorandum (A-41-42),

which seems to have been lifted from a generic website on the Internet. (A-397-

398 and footnote 1 at p. 397)  To reach its preordained conclusion, the District

Court had no medical or scientific opinions or studies upon which to rely.  The

Court's only alternative, therefore, was to assert "common sense."

In addition to the detailed Complaint and referenced scientific articles as to

the physiology involved with the consumption of HFCS, the Court also had before

it an affidavit by a nationally recognized medical expert/scientific researcher, a

Pediatric Endocrinologist, who specializes in childhood diabetes and who

specifically rebutted each and every one of the Court's "common sense"

presumptions.  The expert, Robert Lustig, M.D., explained in detail how each

presumption was incorrect, or at least, without verifiability, and had no bearing on

this particular case.  Lustig's Affidavits and the paragraphs in the Amended

12

Complaint that the Affidavits supplement are totally ignored in the Decision of the Court below.

## Race

The Defendants' memorandum references "race" as a cause of type 2 diabetes referring to "African Americans, Asian Americans and Hispanic/Latin." (A-42)  This was a broad shot in the dark by Defendants as they have not been apprised of the infant Plaintiff's "race."   The Court attempted to sanitize those racial allegations by calling them "genetics." (SPA-7) Regardless, Dr. Lustig devotes two detailed paragraphs (8 and 9 at A-446) wherein he discusses "ethnic groups", "genetics" and diabetes and concludes, without equivocation, that "I am familiar with the infant SEF's clinical situation, diagnosis, and treatment paradigm; and none of these components are factors in the development of her type 2 diabetes."

## Lack of Exercise

The Court's intuitive feelings about "lack of exercise" (SPA-7) are also rebutted by Dr. Lustig. He observes that such concerns have "never been proven to be causative of any type of diabetes, and are wholly irrelevant to the scientific inquiry herein." (A-446)

13

**Obesity**

Furthermore, Dr. Lustig addresses one of the "several [undefined] factors" (SPA-7), one of which is presumably obesity. (A-41, SPA-13)  Dr. Lustig points out that scientifically, while obesity may be "associated" with type 2 diabetes, it has never been established as a direct or proximate cause.  (A-446) He expands upon the fact that there is a significant quotient of thin patients with the disease which works against the above intuitive, anecdotal conclusions of the Court. (A-446)

That the lower Court can presume to conclude, without any reference or access to this child's medical records, without knowing her race and without any correlation to actual science, the self-justifying conclusion that "common sense" establishes the causes of her diseases is ridiculous and frankly, a bit embarrassing.

**Poor Diet**

The District Court also takes judicial notice, based upon its "common sense," that "poor diet" is a cause of type 2 diabetes. (SPA-7)  Here the Court is inadvertently supporting Plaintiff's position.  It is Plaintiff's contention that the infant's diet was excessively high in High Fructose Corn Syrup and that substance, in particular, was a significant contributory factor to her development of the disease.  The Court, while it agrees that poor diet, which would include HFCS, is a recognized cause of type 2 diabetes, it concludes that it would be "difficult" to

14

prove that her condition was caused or contributed by specific foods in her diet. (SPA-7)

This circular reasoning by the Court is inherently contradictory. The Court recognizes that poor diet is a cause of type 2 diabetes. Plaintiff asserts that her poor diet, consisting in significant part of HFCS, was a contributing cause of her type 2 diabetes. (A-445) The Court then concludes, however, that it is only the undefined "poor diet" that was a cause of her diabetes and that it would be "difficult" to prove any specific foods were a cause. (SPA-7) Plaintiff particularizes a significant substance in her diet, actually lists specific foods containing the product in the Complaint (A-191-192) and the Court feels that she is being too specific.

To buttress its position on this question of science, the District Court cites a 1971 version of *Prosser on Torts* regarding proximate cause. It then references a totally dissimilar *McDonalds* class action case that alleges that false advertising under *General Business Law §349* was a cause of obesity, cancer, heart disease, diabetes and other diseases in a class of plaintiffs.[2] That case was totally devoid of scientific references and lacked any empirical evidence that "obesity" was caused by McDonalds foods. Nevertheless, the Second Circuit reinstated the complaint! This court further observed regarding other possible confounders such

---

[2] *Pelman ex rel. Pelman v. McDonald's Corp.* No. 2 CIV. 7821 (RWS), 2003 WL 22052778 (S.D.N.Y., Sept. 3, 2003)

15

as what else the plaintiffs ate, their family histories and how much they exercised

that "this, however, is the sort of information that is appropriately the subject of

discovery, rather than what is required to satisfy the limited pleading requirements

of *Rule 8(a), Fed. R. Civ. P.  Pelman v. McDonalds Corp.* 396 F.3d 508 (2005)

Though totally not on point, even that cited *McDonalds* case is not supportive of

the District Court's position here.

      Furthermore, this is not an obesity case.  This is not a cancer case.  This is

not a heart disease case.  This is not a *General Business Law §349* false advertising

case. This is a case regarding type 2 diabetes.  The *McDonalds* case is so far off the

mark in terms of pleadings, proof and subject matter as to be irrelevant.

      Dr. Lustig addresses the poor diet issue directly and in detail in his

Affidavits as do the allegations in the Verified Complaint. (A-205 to A-210)  Dr.

Lustig points out that prior to HFCS becoming a mainstay of the processed food

industry, type 2 diabetes was virtually "unheard of in children." (A-445)

Specifically, those documents, as well as the referenced scientific literature, the

medical records and evidence reviewed and commented on by Dr. Lustig, establish

that a "cause" of this disease generally and in the Infant, SEF specifically, is the

consumption of high quantities of fructose (the hyper-sweetener and active

ingredient in HFCS) over an extended period of time. (A-448)

16

## POINT II

## PRODUCT LIABILITY

### Wrong Legal Standard Used by Court

The District Court takes the strident (and incorrect legal) position that the Complaint must also be dismissed because it pleads only that the product was "not reasonably safe" as opposed to "unreasonably dangerous." (SPA-12-14) However, the *PJI* charge and the commentary take a contrary position:

> The Pattern charge uses the phrase "not reasonably safe" rather than "unreasonably dangerous", because the latter phrase carries with it a connotation of extrahazardous danger that the former does not and could confuse the jury. The Court of Appeals has concluded that a design defect may render a product "not reasonably safe' and has adopted that standard.
> *Haran by Haran v. Union Carbide Corp.*, 68 N.Y. 2d 710, 506 N.Y.S.2d 311 (PJI 2:120, Vol. 1A p. 744, 2014)

The ultimate question in this products liability case is whether the artificial, totally manmade product, HFCS, is "not reasonably safe." *(The New York Pattern Jury Instructions 2:120*)

The evidence before the Court is that the active ingredient, fructose, is a substance that has been shown by peer reviewed research to be a cause of metabolic disease and type 2 diabetes. If it is shown scientifically that an artificial manmade product causes a severe life-long disease, then it would seem that, at a minimum, there would be a question of fact as to whether it is

17

"reasonably safe" or not.  The District Court's "unreasonably dangerous" standard does not appear to be a correct application of the law and dismissal upon that ground is in error.  (SPA-13-14)

### "Not Reasonably Safe" Standard

Using the correct legal standard for products liability, the proof and the Complaint demonstrate that HFCS and sugar, despite contrary presumptions and propaganda, are different. At issue, then, is the unique man-made product that contains high levels of an arguably dangerous substance.  Though found in nature, the active ingredient, fructose, is only available at different concentrations and much higher doses in HFCS.

For a product liability claim to prevail, it must be found by a jury that an ordinary consumer, who was shown the evidence that HFCS and sugar are not identical substances would regard HFCS as "not reasonably safe."  That is the first issue to be considered: Whether an ordinary consumer who was aware of the higher concentrations of fructose in products containing HFCS than those made with sugar, as well as the myriad of other consequential differences between the two substances and the science regarding long term consumption of HFCS, would conclude that the HFCS was "not reasonably safe?" No doubt, simple sugar, where the "risks" are well know, established and accepted in society, would be put up by

Defendants as a comparison and defense. However, those are considerations of fact for the jury.

Plaintiff's expert, Dr. Lustig, attests to the fact that the HFCS that this young plaintiff consumed over the course of her lifetime was a significant contributing cause of her developing of the disease, type 2 diabetes. The District Court's extrapolation is that since sucrose occurs naturally, then a "similar" artificial chemical substance, HFCS, *ipso facto*, cannot be considered "unreasonably dangerous" (SPA-13) or, presumably, "not reasonably safe" is error.

Respectfully, sugar is not on trial and is not the issue. The unique and totally artificial chemical product "HFCS" is the subject of the suit. It is shown to cause the disease contracted by the infant plaintiff. A cause of action is stated and questions of fact exist.

**Failure to Warn**

If a chemical product with a different molecular structure than anything found in nature is found  or known to be "not reasonably safe", then the issue is whether the manufacturer is obligated to warn of possible consequences of its use and presumably, the amounts, concentrations, and percentages of the fructose contained and used in commercial products.

Even if HFCS was limited to 50%-50%, according to the research and the affidavit of Defendants' own expert, Dr. White, HFCS still is molecularly

19

different, is sweeter than sugar and has different metabolic effects. (A-113-116)  A basic issue is quantity of fructose over time, the long term delayed effect and physical consequences and the diseases it causes.  That is what the scientific evidence proves.

With the introduction of the "sweeter than sugar" HFCS, the prevalence of type 2 diabetes in infants has increased exponentially over the last 30 years.  The science is that fructose, particularly that contained in HFCS, is contributing to and is causing metabolic disease and type 2 diabetes over time.  An obvious issue is the quantity of fructose consumed by infants generally and SEF specifically over their limited lives to date.

Unaddressed/ignored by either the lower court or the Defendants are the super high concentrations of HFCS at 90% fructose and 99.9% pure "crystalline" fructose.  Concentrations at these levels have never been considered nor approved by the FDA.  They are not identified on product labels except as "sugar."  Yet they are in almost all processed foods as is admitted on the Defendants' website list attached to Plaintiff SEF's Reply Affidavit. (A-298 to A-299)

Without discovery, neither Plaintiff nor any consumer, or even any independent scientists, are likely to be able to discern the amount of fructose in any product being consumed.  No consumer knows how much 99% crystalline fructose is in the crackers, pretzels, fruit drinks, tomato sauces, salad dressings, ice cream

20

or the milk they ingest (A-298-299) as that product is not identified in that manner on labels (A-291-299), let alone the quantum of "sugar" allocated to that substance on the ingredient label.   That consumers might be intentionally misled by labeling is both obvious and easy to see how it has come about.   As the U.S. Supreme Court recently observed, "the FDA does not pre-approve food and beverage labels under its regulations and instead relies on enforcement actions, warning letters and other measures."   *Pom Wonderful LLC v. Coca-Cola Co.,* ___ U.S. ___, decided June 12, 2014 at 12.   Furthermore, "the FDA acknowledges that it does not necessarily pursue enforcement measures regarding all objectionable labels."   (*Id.* at 15)

The District Court fails to address the substance of  the "failure to warn" claim in Plaintiff's Complaint, let alone recognize that the labels and (non-existent) warnings on food products also fail to list and identify actual ingredients such as fructose 90% and crystalline fructose 99.9%.   The issue of warnings for Defendants' products is properly one for a jury's consideration.

Consumers do not know the conversion tables or their accuracy, if any, of "HFCS to sugar" on labels.   With sucrose, it is determined by nature that the ratio is 50/50%.   Sugar is never marketed at any concentration level but 50/50%.   With HFCS, however, the active in ingredient, fructose is never marketed at the same concentrations as found in sugar and fruits.   Its concentration is invariably higher, at an admitted percentage of 55%.   It has been discovered, in non-industry

21

sponsored scientific testing, that soft drinks have fructose concentrations consistently at 65%, despite the industry's claim that 55% is the only (and highest) concentration marketed.  55% is actually the lowest percentage at which HFCS is acknowledged as being in products.  Never acknowledged are the amounts of HFCS 65%, 90% and crystalline fructose 99.9% in concoctions created by "food formulators."

It is difficult for scientists, researchers, let alone the public, to assess and evaluate products containing HFCS if they are not reviewed or evaluated by the FDA, not evaluated scientifically and researchers have a difficult time figuring out the concentrations of the fructose in products given manipulations with ingredient labels and the fungibility of the product.

The *reductio ad absurdum* argument by analogy of the District Court that this case is just like the cigarette cases totally misses significant points in those cases:  With cigarettes, there is an acknowledged dangerous product that is not banned due to culture and tradition (SPA-16).  The "product" is restricted in sales to adults only and is taxed at a penal level to further discourage use.  Furthermore, the public is strongly warned through specific labeling of the dangers associated with use/consumption of the product.  Those cases are tried on the failure to warn theory consistent with the *Pattern Jury Instructions* that the manufacturer has "a

22

duty to use reasonable care to give adequate warning of any danger known to it or which . . . it should have known." *PJI 2:120.*

With HFCS, the marketing is heavily directed at infants, especially on Saturday mornings. The product is very cheap. It is sweeter than sugar. This is a known fact that the industry and "food formulators" use to make product more attractive than those products merely enhanced by simple sucrose. There are no warning labels, even for children who could attempt to read labels, of the addictive quality of HFCS as well as the negative physical consequences that follow from long term consumption. That manufacturers should be asked to first identify the specifics of their substance in the final product is not too much to ask nor are warning labels setting forth risks associated with long term use. This is a question for a jury using the "reasonable man standard." (A-316-317)

Unless the actual percentages and qualities of fructose in the HFCS are disclosed relative to "less sweet" sugar, it is difficult to make a reasoned statement as to the proper percentages for an "alternative safer design" though it is likely, but not even certain, that 50/50% would be less dangerous. (A-79) However, clearly less fructose, since it is the active and causative ingredient, would seem to be a safer design as opposed to the high concentrations of super sweet HFCS 65%, 90% and 99%. We do have these alternative concentrations in the marketplace, but they have not been tested. Rather, while the industry is using our children and the

population generally as a grand experiment, they expect and recoup full profits. They expect free ability to fully advertise and exaggerate to the very young and impressionable with no oversight or responsibility.   The adverse, long term negative consequences are beginning to impact our society and they still hide and shill.  Note – The cigarette cases do not turn on or suggest to the jury alternative safer designs.  Tobacco is carcinogenic.  That is a fact and safer alternatives are not the issue nor an impediment to bringing cases.  Failure to warn is the crux of those cases.

Not only are there questions of fact here regarding the inherent safety and dangers associated with this man-made product, there also is an obligation to warn the consumer about the effects of consumption by proper and complete warnings. The Complaint should be reinstated.

**POINT III**

**MARKET SHARE LIABILITY**

A straight forward legal question before this Court is whether the pleadings set forth justification for use of a Market Share approach.  The seminal case in New York is *Hymowitz v. Eli Lilly and Co.*, 73 NY2d 487 (1989).  The criteria the New York Court of Appeals took into consideration assess certain factors.  The first, about which there is no disagreement, is that the product must be fungible. That is, the product and formula must be identical such that, were attempts made to

24

differentiate, manufactures still could not be separately identified.  That is clearly the case here and there were no arguments or submissions to the contrary.

Likely of lesser importance is that there be a period of latency or that the physical manifestations of the disease be significantly removed from the date of exposure.  The delay in time in *Hymowitz* was so long that plaintiffs were not able to determine by whom the pills were manufactured.

Here, while the Infant Plaintiff is able to identify a significant number of products she consumed from birth onward that contained the HFCS, it is not the maker of the general food product that is a defendant but rather the maker of the critical ingredient.  The Plaintiff can and has identified many products containing HFCS she consumed over the course of her lifetime.  However, she is not able and, apparently it is not possible, for a consumer to identify which HFCS manufacturer made the HFCS in which products she ate.  Furthermore, as what she ate changed as she grew older and her disease developed.  It is unknown and not possible to determine whether the HFCS in each product was consistently from just one or several of the Defendant manufacturers. The second prong of *Hymowitz* that the disease developed over a long period of time would also seem to be satisfied.

In a significant reach in analysis, the District Court extrapolated that before any Market Share claim would be permitted in New York, the legislature would have to speak regarding the particular product. This was considered to have to

25

occur before the courts would be permitted to act.  In support of this analysis, it was pointed out that the "legislature made a clear policy decision to remove these time barred DES claims." (SPA-10)

This is a bit of hyperbole. What actually transpired was that the legislature amended CPLR 214-c, and created a statute of limitations category of one year from date of discovery for long germinating diseases. Contrary to the District Court's claims (SPA-10), that statute has application to all types of cases including asbestos, chlordane, polyvinyl chloride, DES and tungsten-carbide, *Hymowitz*, 73NY2d 511 at 513.  As that statute was enacted at or about the time the DES cases were litigated, the Court of Appeals referenced the above product liability claims where there were long periods of dormancy.  Such claims became recognized as viable for one year from the date of discovery of the injury.  For the District Court here to rationalize inapplicability of Market Share Liability on effectively statute of limitation considerations in a case involving an infant is mistaken.

The above analysis, possibly concocted in an attempt to distinguish *Hymowitz,* is compounded by references to the lead paint cases where Market Share was disallowed.  The Appellate Division in *Bremer v. Amer. Cyanamid Co.*, 263 AD2d 165, 699 NYS2d 848 (4th Dept., 1999), cited by the court below, listed at least two significant distinctions from the case at bar.  First, some of the named

26

defendants in *Bremer* only manufactured lead paint for outside use whereas the injuries in that case were clearly from interior paint. Obviously, if a named defendant did not produce the product that was used where a plaintiff was alleged to have contracted the illness, that defendant should be dismissed from the action. That is an easy distinction and decision.

Chemical analysis in *Bremmer* demonstrated that there were many different lead compounds taken from the paint in plaintiff's apartment though the named defendants were manufactures of only one of the identified compounds. Apparently, there were many different lead paints that had been used and apparently contributed to the illness but only the manufacturer of one was a named defendant. *Bremmer* was not about "how much lead" was used. It was about identifiable, different lead compounds, which, obviously, were not "fungible." *Bremmer* did not qualify for Market Share because, first and foremost, because the product was not fungible.

Also mistaken/misstated in the lower courts "analysis" is that like *Brenner* and unlike *Hymowitz*, here there is no "signature injury" as "the injuries alleged could have been caused by some other source." (SPA-11) That observation by the Court is again in error. Here, there are no demonstrated causes of the "signature injury", type 2 diabetes, other than fructose and HFCS specifically. Obesity, race, lack of exercise were all specifically addressed and discounted as causes of this

27

"signature injury."  Obviously, the Court's conclusion in this regard relates back to its initial "common sense" presumption that type 2 diabetes is a "multifactorial disease." (SPA-7)  If the predicate, the assumption is invalid, then the conclusion also does not follow and the syllogism is flawed and fails.

The other extremely dissimilar case that the District Court references in an attempt to justify its dismissal of SEF's claim is the gun case, *Hamilton v. Beretta USA Corp.*, 96 NY2d 222, 727 NYS2d 7 (2001).  All guns are neither alike nor fungible.  That is a significant distinction at the very beginning as HFCS is fungible.  There are many laws regulating different types of guns.  In fact, it was proven in *Hamilton* that the bullet that caused the injury was not even from a gun manufactured by the defendant.  The only way a creative plaintiff's attorney could attempt to access liability and coverage was to attempt to sweep his singular gun case into a Market Share enterprise claim.  Though creative, that case was properly dismissed.

The case at bar clearly is neither analogous nor even similar to any of those cited as justification for dismissal on the Market Share theory by the lower court. This case fits and qualifies for that type of allocation of responsibility.  Plaintiff has brought in the significant manufacturers of the product nationwide and the product is clearly fungible.  This part of the decision should be reversed.

28

## POINT IV

As to other issues that this Court may consider germane but were not addressed in the lower court's decision, such as preemption, Plaintiff SEF does not abandon her position but rather refers the Court to the submissions, Memoranda and Affidavits in support of her positions that are in the Record. (See, A-306-308, A-394, and *Pom Wonderful LLC v. Coca-Cola Co.*, ___, U.S. ___, decided June 12, 2014)

## CONCLUSION

The Amended Complaint, the supporting affidavits and documentation state causes of action that are appropriate for jury consideration. The Amended Complaint should be reinstated.

Dated: June 27, 2014

LAW OFFICE OF J. MICHAEL HAYES

s/      J. Michael Hayes
J. Michael Hayes, Esq.
*Attorneys for the Plaintiff-Appellant*
Office and P.O. Address:
69 Delaware Avenue – Suite 1111
Buffalo, New York 14202
Telephone: (716) 852-1111

29

**SPECIAL APPENDIX**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

Page

Decision and Order Granting Plaintiff's Motion for Leave to Amend
    Complaint and Granting Defendants' Motions to Dismiss, filed
    April 22, 2014 [Dkt. #42] .......................................................SPA-1

Judgment filed April 22, 2014 [Dkt. #43] ....................................................SPA-18

SPA-1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

S.F., as parent and natural guardian of
S.E.F., an infant,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    13-CV-634S
ARCHER-DANIELS-MIDLAND COMPANY,
CARGILL, INC., INGREDION INCORPORATED,
PENFORD PRODUCTS CO.,
TATE & LYLE INGREDIENTS AMERICAS,
LLC, and ROQUETTE AMERICA, INC.,

                    Defendants.

## I. INTRODUCTION

The Plaintiff asserts that high-fructose corn syrup is a toxic substance and that its

manufacturers are liable under the tort doctrines of strict liability, negligence, and failure

to warn. Both the true Plaintiff, S.E.F, and her mother, S.F., who brings this claim on her

daughter's behalf, are identified only by their initials to protect the daughter's identity.[1]

Invoking this Court's diversity jurisdiction, Plaintiff, who was fourteen years old at the time

the complaint was filed, asserts that high-fructose corn syrup, which she consumed in

familiar foods like Pepsi and McDonald's hamburger buns, was a substantial factor in

causing her to develop Type 2 diabetes.

All Defendants – five manufacturers of high-fructose corn syrup (commonly referred

to in the industry by the initialism "HFCS") – now move to dismiss this action under Federal

---

[1] Under Rule 5.2(a) of the Federal Rules of Civil Procedure, only a minor's initials should be used in all publicly filed documents. Further, "[s]ince a parent must proceed on behalf of a minor child, the protection afforded to the minor would be eviscerated unless the parent was also permitted to proceed using initials." P.M. v. Evans-Brant Cent. Sch. Dist., No. 08-CV-168A, 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008) (Schroeder, Jr., M.J.) (Report and Recommendation adopted in full).

SPA-2

Rule of Civil Procedure Rule 12(b)(6). They contend that Plaintiff has failed to state a plausible claim for relief. More to the point, they argue that Plaintiff cannot causally connect HFCS to the disease; that, by grouping all the manufacturers together as one unit, she cannot connect the alleged harm to any one particular defendant; and last, that federal food-additive laws preempt her claim.

In response to Defendants' motions to dismiss, Plaintiff filed required briefing and moved for leave to amend her complaint; she contends that the proffered amendments cure any deficiencies highlighted by Defendants in their motions. Defendants disagree. The proposed amendments, they argue, are futile and do not save her deficient claim.

As an initial matter, this Court will grant the motion to amend and construe the motion to dismiss against the amended complaint, which Plaintiff attached to her motion for leave to file it. The new complaint adds context and detail to her claim; it does not add new causes of action. And Defendants – in what effectively resulted in another round of briefing on the motions to dismiss – have responded to the amended complaint, eliminating the potential for any undue prejudice they may have suffered by virtue of the amended pleading. See, e.g., Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

Despite this, for the reasons discussed below, the amended complaint must be dismissed.

SPA-3

## II. BACKGROUND

A.   **High-fructose corn syrup & Plaintiff's claim**

Some facts are universally regarded as accurate. For one, as the name suggests, high-fructose corn syrup is derived from corn; though it is an over-simplification, HFCS is essentially made by exposing cornstarch to various enzymes and water. That process ultimately produces a sweet aqueous solution consisting of fructose and glucose. Fructose is often (though not always) found in slightly higher concentrations in HFCS than it is in sucrose – or simple table sugar, which has a 1:1 ratio of glucose and fructose.[2] Other, less common forms of HFCS, however, can contain much more fructose than sugar. (See Am. Compl. ¶ 25.)

HFCS was first integrated into the American food supply in the 1970s. (Id. ¶ 21) Because of the syrup's lower cost, it is commonly used as a substitute for sugar in processed foods. (Id. ¶ 23.) The Coca-Cola Company and PepsiCo., for example, began using HFCS instead of sugar in many of their beverage products in the 1980s. (Id. ¶ 23). There is no dispute that each defendant manufactures HFCS. There is also no dispute that fructose itself is an organic compound found naturally in a wide variety of fruits – like grapes, pears, and figs.

Other facts, this Court is aware, are vigorously contested by those in the science and nutrition communities, as well as by close observers of what has become a developing

---

[2] According to a study published in the American Journal of Clinical Nutrition, it is called "high" fructose corn syrup because there is more fructose than ordinary corn syrup, which contains more glucose and is not as sweet as sugar or HFCS. John S. White, *Straight talk about high-fructose corn syrup: what it is and what it ain't* 88, No. 6 Am. J. Clin. Nutr. 1716–21 (2008),  available at http://ajcn.nutrition.org/content/88/6/1716S.full

controversy.[3] But that debate is largely immaterial to the motion before this Court because facts alleged in Plaintiff's complaint (though not labels or legal conclusions) must be accepted as true for the purposes of resolving this motion. See Ashcroft v. Iqbal, 556 U.S. 662, 668, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). This Court is not in a position to make findings of fact on the hotly debated health effects of sugar and high-fructose corn syrup. Rather, this Court summarizes the allegations here for the purposes of context and background.

To that end, Plaintiff alleges that fructose is metabolized differently than glucose – "almost entirely in the liver" – and that it can therefore lead to insulin resistence. (Am. Compl. ¶ 28.) This lack of insulin, she alleges, creates rising levels of glucose, which in turn, leads to Type 2 diabetes. High-fructose corn syrup, Plaintiff also alleges, "by-passes the insulin-driven satiety system, suppressing the degree of satiety that would normally result from a meal of glucose or sucrose." (Id. ¶ 35.) High-fructose corn syrup, in short, makes Plaintiff and others feel hungry when they should feel full. This "stimulates excessive and continued consumption." (Id. ¶ 46.) By extension, fructose is a "major cause of metabolic syndrome and Type 2 diabetes." (Id. ¶ 52.)

Plaintiff therefore alleges that her consumption of HFCS, supplied by Defendants and used in various end-products, such as popular soft drinks that "contain[] an average of 64-65% fructose" (id., ¶ 66), caused, or at least was a substantial factor in causing, the disease from which she now suffers – Type 2 diabetes.

---

[3]The Corn Refiner's Association's website, http://sweetsurprise.com, urges its visitors to learn why "HFCS has become a frequent topic of health discussions." The association represents companies that make the syrup.

-4-

**B.     Procedural history**

Plaintiff filed a complaint in this Court on June 17, 2013. After the parties stipulated to an extension, Archer-Daniels-Midland Company, Cargill, Inc., Ingredion, Inc., and Tate & Lyle Ingredients Americas, LLC filed a joint motion to dismiss on August 30, 2013. Roquette America, Inc. filed a separate motion on September 13, 2013, but it largely incorporated the arguments made in the earlier motion.

Plaintiff then moved to amend her complaint on September 25, 2013. Briefing concluded on all the motions on November 15, 2013, at which time this Court took them under consideration.

### III.  DISCUSSION

**A.     Rule 12(b)(6)**

Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim. Fed. R. Civ. P. 8(a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, 493 F.3d at 98. Legal conclusions, however, are not afforded the same presumption of truthfulness. See Iqbal, 556 U.S. at 678 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

-5-

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570). Labels, conclusions, or a "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged. Iqbal, 556 U.S. at 678. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief. Id. at 678; Fed. R. Civ. P. 8(a)(2). Well-pleaded allegations must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

**B.    Defendants' motion to dismiss[4]**

In essence Plaintiff contends that Defendants are liable for placing an unreasonably dangerous product in the stream commerce and for failing to warn of its dangerousness. To this end, she brings three causes of action: negligence (and gross negligence), strict products liability, and failure to warn.

To state any of these claims, a plaintiff must plausibly plead that her injury was a result, was a proximate cause, of the defendant's conduct.   See, e.g., Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107, 450 N.E.2d 204, 208 (1983). Defendants contend that Plaintiff has not adequately alleged that their HFCS – and not one of the many other factors that can lead to the development of Type 2 diabetes – plausibly caused (or was a substantial factor in causing) her disease. They therefore argue that the complaint must

---

[4]All parties apply New York law.  Plaintiff resides in New York and presumably consumed HFCS in New York. Thus, sitting in diversity, this Court will apply New York law. See, e.g., Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (implied consent to New York law sufficiently answers any choice-of-law question).

be dismissed for failure to plead proximate causation.

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. 662 at 679.  And where "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. (citing Fed. R. Civ. P. 8(a)(2)).

As Defendants point out, Type 2 diabetes is a multifactorial disease. It can be caused by, for example, a lack of exercise, genetics, or poor diet  – or some combination of several factors.  No expert opinion is required to arrive at this conclusion. See id., 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense."). Yet, even accepting the allegations in the complaint as true, there is little in it to suggest that Plaintiff could prove that her consumption of some foods containing HFCS over the course of her life was a substantial factor in causing Type 2 diabetes. In other words, aside from idly listing various common foods she has eaten, Plaintiff offers limited facts that might lead this Court to believe that she could ultimately show that it was her consumption of these foods, and specifically the HFCS found within these foods (manufactured by these defendants) that led to her disease. One treatise captures this problem in a manner that calls to mind the now-relevant pleading standard by noting that "[a] mere possibility of such causation is not enough." WILLIAM L. PROSSER, LAW OF TORTS § 41 (4th ed.1971); see Twombly, 550 U.S. at 557–58 ("[W]e explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed

to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value."). It may be possible that HFCS caused Plaintiff to develop Type 2 diabetes, but (based on the facts in the complaint) is it plausible?

In a case brought against McDonald's for its high-fat content food in the Southern District of New York, the court there essentially answered this question in the negative; it found that the plaintiffs failed to plead proximate causation. Pelman ex rel. Pelman v. McDonald's Corp., No. 02 CIV. 7821 (RWS), 2003 WL 22052778, at *12 (S.D.N.Y. Sept. 3, 2003). Specifically, the district court found that the plaintiffs failed to "isolate the particular effect of McDonald's foods on their obesity and other injuries," and thus dismissed the case under Rule 12(b)(6). Id.  In other words, the plaintiffs failed to show through their pleadings that McDonald's foods could have been a substantial factor in causing their obesity.  Although the Second Circuit reversed, finding that "this sort of information [] is appropriately the subject of discovery," 396 F.3d 508, 512 (2d Cir. 2005), that ruling's "continuing viability is open to question in view of the Supreme Court's subsequent interpretation of the requirements of Rule 8(a)." Lovell v. GEICO Gen. Ins. Co., No. 12-CV-00546 A M, 2013 WL 7871497, at *5 (W.D.N.Y. Mar. 29, 2013) (McCarthy, M.J.). Indeed, the concept that implausible claims can be weeded out in discovery, a concept highlighted by the Pelman panel ("Th[e] simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to . . . dispose of unmeritorious claims," the panel wrote), was dispelled by Iqbal and Twombly. The Supreme Court held in Twombly that "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery

process. 550 U.S. at 559. The Iqbal Court echoed that sentiment: "only a complaint that states a plausible claim for relief" can "unlock the doors of discovery." 556 U.S. at 679.

But even assuming Plaintiff could surpass this hurdle, her claims fail for other reasons.

### 1.   Market-share liability does not apply

In response to Defendants' arguments that Plaintiff has engaged in impermissible group pleading – that is, making undifferentiated allegations against the defendants as a group without identifying any wrongdoing on the part of any particular defendant – Plaintiff effectively concedes as much, but asserts that her claim should not be dismissed on this ground because she is proceeding under the doctrine of market-share liability.

Although the New York Court of Appeals has not determined whether market-share liability would apply in a situation such as this, this Court finds that New York  would not permit Plaintiff to proceed under that theory.[5]

Market-share liability, which has been "sparingly adopted," Matter of New York State Silicone Breast Implant Litig., 166 Misc. 2d 85, 88, 631 N.Y.S.2d 491, 493 (Sup. Ct. 1995), "provides an exception to the general rule that . . . a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury." Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001). When the theory is permitted, "a defendant may be held liable absent any showing that it caused or contributed to the plaintiff's injury; instead, a defendant may be presumed liable to the extent of its share of the relevant product market." In re Methyl Tertiary Butyl Ether (MTBE)

---

[5] "Where there is no decision by the state's highest court[,] then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." Travelers Ins. Co. v. 633 Third Associates, 14 F.3d 114, 119 (2d Cir. 1994) .

Products Liab. Litig., 725 F.3d 65, 115 (2d Cir. 2013) (citing Hymowitz v. Eli Lilly & Co., 73 N.Y.2d 487, 511–12, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989)); see also New York Tel. Co. v. AAER Sprayed Insulations, Inc., 250 A.D.2d 49, 54, 679 N.Y.S.2d 21, 25 (1st Dep't 1998) ("[T]he burden of proof may shift upon a mere showing that the defendants were engaged in manufacturing the product at issue, without reference to any proof that it was their particular product that caused injury to the plaintiff.").

In New York, the doctrine finds its roots in Hymowitz, where the New York Court of Appeals held that "plaintiffs injured by the drug DES were not required to prove which defendant manufactured the drug that injured them but instead, every manufacturer would be held responsible for every plaintiff's injury based on its share of the DES market." Hamilton, 96 N.Y.2d at 240.

"Key" to the court's decision in Hymowitz "were the facts that (1) the manufacturers acted in a parallel manner to produce an identical, generically marketed product; (2) the manifestations of injury were far removed from the time of ingestion of the product; and (3) the Legislature made a clear policy decision to revive these time-barred DES claims." Hamilton, 96 N.Y.2d at 240. "New York courts have declined to apply the theory in cases that do not meet that criteria." Moreno v. Am. Home Products, Inc., No. A-3935-07T2, 2010 WL 4028605, at *6 (N.J. Super. Ct. App. Div. July 12, 2010) (citing Hamilton, 96 N.Y.2d 222). In fact, New York's highest court has "refused to recognize [market-share liability] in any other context." Enright by Enright v. Eli Lilly & Co., 77 N.Y.2d 377, 385, 570 N.E.2d 198, 202 (1991).

Plaintiff contends she ought to be able to proceed under this theory because HFCS is a fungible product and she cannot identify which company manufactured the HFCS that

SPA-11

she consumed. But "[i]nability to locate evidence [] does not alone justify the extraordinary step of applying market share liability." Hamilton, 96 N.Y. 2d 241. And fungibility is only one factor germane to the analysis. The other two "key" factors are absent here; there is no claim that the "manifestations of injury were far removed from the time of ingestion of the product" and certainly there has been no legislation suggesting an overriding public interest in allowing claims like this to proceed in this manner. Plaintiff does not argue otherwise.

Other considerations contemplated in determining if a plaintiff can proceed under this theory are also lacking. The Fourth Department of New York's Appellate Division identified those factors in Brenner v. Am. Cyanamid Co., 263 A.D.2d 165, 171, 699 N.Y.S.2d 848, 852 (4th Dep't 1999). Weighing each factor, the Brenner court concluded that application of the market-share theory was inappropriate for claims against manufacturers of lead used in lead-based paint.

Like Brenner – but unlike Hymowitz – here there is no "signature injury" definitively linking the product to the harm – as adenosis is linked to DES, mesothelioma is linked to asbestos, or emphysema is linked to cigarette smoke. The Brenner court's finding on this point is applicable here. It rejected the plaintiff's claim because the plaintiff's "injuries could have been caused by some source other than [the alleged defective product]." 263 A.D.2d at 173; see also Giles v. A. Gi Yi, 105 A.D.3d 1313, 1318, 964 N.Y.S.2d 319, 323 (4th Dep't 2013) (dismissing complaint because, among other reasons, the injuries alleged "could have been caused by some source other than lead").

Another factor "considered by the court in Hymowitz was the exclusive control of DES manufacturers over any risk produced by their product." Brenner, 263 A.D.2d at 172. But here, again like Brenner, manufacturers of HFCS do not have exclusive control of the

-11-

Case: 14-1615    Document: 32    Page: 46    06/27/2014    1259305    52

risk. There is no dispute that the makers of the end-products – not the defendants – decide "what quantities" of HFCS to use, just as the manufacturers of the paint – and not the manufacturers of the lead – decided how much lead to use.

Because these factors, some deemed "key," are absent on the face of Plaintiff's complaint, and considering the telling fact that New York has not recognized market-share liability as a permissible theory of recovery outside the DES context (a context which the New York Court of Appeals stressed was "singular"), this Court concludes that New York would not allow Plaintiff to recover under a market-share theory in this case. Because Plaintiff concedes that this is *the* theory under which she seeks recovery, her claims – whether for negligence, strict liability, or failure to warn – must be dismissed. See, e.g., Zalewski v. T.P. Builders, Inc., No. 1:10-CV-876 GLS/RFT, 2011 WL 3328549, at *5 (N.D.N.Y. Aug. 2, 2011) ("The court will not accept . . . vague group pleading to serve as a basis for liability."). See also Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of [] the collective term 'Defendants' . . . with no distinction as to what acts are attributable to whom," the complaint must be dismissed); Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [Rule 8's] minimum standard.").

### 2.      Not unreasonably dangerous

There is a second reason why this complaint must be dismissed even if causation is adequately pled: Plaintiff fails to plead that HFCS is unreasonably dangerous.

Plaintiff points to the high concentration of fructose in HFCS as the source of her illness. HFCS, she alleges, is more dangerous than sugar because of the way fructose is

SPA-13

processed in the body. (<u>See, e.g.</u>, Am. Compl. ¶ 28) ("Since fructose is metabolized differently than glucose, it can and does lead to insulin resistence."). But fructose is a naturally occurring compound, found in everyday, commonly-consumed fruits like grapes and pears. Certainly Plaintiff is not suggesting that these fruits are "toxic" substances. Yet this is precisely what Plaintiff appears to suggest: she does not distinguish between fructose found in fruit and fructose found in HFCS; rather, she alleges that "[f]ructose" – *not high-fructose corn syrup* – "is a major cause of metabolic syndrome and type 2 diabetes." (Am. Compl. ¶ 52.) The studies attached to Plaintiff's amended complaint, on which she relies in bringing this claim, naturally arrive at the same conclusion: it is the *over-consumption* of *fructose* that may lead to increased obesity and other adverse health effects. <u>See</u> Miriam E. Borcarsly, *et al.*, *High-fructose corn syrup causes characteristics of obesity in rats: Increased body weight, body fat, and triglyceride levels,* 97 Pharmacology, Biochemistry and Behavior, 101-06 (2010) (concluding that "*over-consumption* of HFCS could very well be a major factor in the 'obesity epidemic' because *fructose* is processed differently than sucrose) (emphasis added); Theodore J. Angelopoulos, *et al.*, *The Effect of High-Fructose Corn Syrup Consumption on Triglycerides and Uric Acid*, The Journal of Nutrition (Supplement) (2009) ("There is considerable evidence of a detrimental effect on metabolic health of *excess fructose consumption*."). (Emphasis added.)

But even accepting this premise as true, it alone does not state a products-liability claim. To be liable, Defendants' product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." Restatement (Second) of Torts § 402A (1965). If there is no difference between HFCS and simple fructose, HFCS can hardly be said to be unreasonably dangerous. As the Second

Restatement of Torts memorably puts it: "good butter is not unreasonably dangerous merely because, if such be the case,  it deposits cholesterol in the arteries and leads to heart attacks." Id. Indeed, "many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption." Id. Particularly relevant to that final point is the uncontested fact that Defendants – as  manufacturers of HFCS – do not control how much HFCS is used in the finished products that Plaintiff consumed.

Each cause of action therefore must be dismissed because the amended complaint fails to plausibly allege that HFCS is unreasonably dangerous. See Affuso v. Crestline Plastic Pipe Co., Inc., 194 A.D.2d 884, 885, 599 N.Y.S.2d 157, 158 (1993) (dismissing claims because "[p]laintiffs [] failed to show that [the defendant] breached a duty of care owed to plaintiff by placing a defective, *unreasonably dangerous* product on the market, with actual or constructive notice of the defect, due to a mistake in the manufacturing process, improper design or because of a failure to warn") (emphasis added).

### 3.    No safer alternative pled

Finally, regarding Plaintiff's claims for negligence and design defect, there is a third reason why this case must be dismissed even if the complaint adequately pleads causation.

Under New York law, in addition to a claim for failure to warn, a plaintiff may make two types of claims sounding in strict products liability: (1) a manufacturing defect, which results when a mistake in the manufacturing process renders a product that is ordinarily safe dangerous, and (2) a design defect, which results when the product as designed is not reasonably safe for its intended or foreseeable use. Caruolo v. A C & S, Inc., No. 93

-14-

CIV. 37529 RWS, 1999 WL 147740 (S.D.N.Y. Mar. 18, 1999) (citing Voss, 59 N.Y.2d at 106–07).

Plaintiff does not distinguish between manufacturing-defect and design-defect claims, but only a design-defect claim would be appropriate based on the facts alleged in her complaint; she is not claiming that there was some mistake or error in the manufacturing process.[6]

"To state a claim for defective design under New York law, a plaintiff must allege: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." DiBartolo v. Abbott Labs., 914 F. Supp. 2d 601, 621 (S.D.N.Y. 2012) (internal quotation marks omitted).

Plaintiff's claim here fails at the second prong; she does not attempt to allege how HFCS could be made safer. If, as Plaintiff suggests, it is the elevated levels of fructose in HFCS that make it unreasonably dangerous, then it is at least conceivable that a formulation of HFCS with lower levels of fructose would be a safer alternative. But Plaintiff fails to allege as much.  Instead she argues that all HFCS – even those formulations with a lower fructose-to-glucose ratio than sugar – is unsafe, regardless of its composition. "High Fructose Corn Syrup in varying and multiple concentrations," she alleges, "was not reasonably safe and not fit for the ordinary purposes for which it was used." (Am. Compl.

---

[6]This applies to her negligence claim too. "In a defective design cause of action, a claim for negligent design defect is functionally synonymous with a claim for strict products liability with respect to the manufacturer." Rose v. Brown & Williamson Tobacco Corp., 53 A.D.3d 80, 94, 855 N.Y.S.2d 119 (1st Dep't 2008) (Catterson, J., dissenting) (citing Denny v. Ford Motor Co., 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995)).

-15-

SPA-16

¶ 80.) This contradicts her earlier claim that HFCS is more dangerous than sugar *because* of its elevated levels of fructose and it fails to demonstrate how HFCS' risks could be removed without destroying its utility. See. e.g., Voss, 59 N.Y.2d at 109; see also DiBartolo, 914 F. Supp. 2d at 623 (dismissing design-defect claim on a 12(b)(6) motion because plaintiff failed to adequately allege a safer alternative design).

Plaintiff might be suggesting that HFCS should not be used at all, and that sugar ought to be used in its place. But such an "impos[ition] [of] state law tort liability on the manufacture and sale of [HFCS] now on the market" would constitute "a virtual ban on [HFCS]." Clinton v. Brown & Williamson Holdings, Inc., 498 F. Supp. 2d 639, 648 (S.D.N.Y. 2007) (discussing failure of plaintiff to show that there was a feasible alternative design for cigarettes). The Clinton court went on, "The vast majority of courts have been markedly unreceptive to the call that they displace markets, legislatures, and governmental agencies by decreeing whole categories of products to be 'outlaws.'" Id. Finally, it concluded emphatically, "This is exactly the type of claim that Voss's alternative feasible design requirement was meant to disallow." Id. Thus, if the only alternative is an outright ban, no design-defect claim will stand. For this reason too, the negligence and design-defect claims must be dismissed.

### IV. CONCLUSION

Plaintiff brings causes of action for negligence, design defect, and failure to warn against several makers of high-fructose corn syrup. Each of those claims, however, must be dismissed for several reasons, including Plaintiff's failure to plead that HFCS is unreasonably dangerous and her failure to connect her disease to the actions of any one defendant.

-16-

SPA-17

Plaintiff's claims for negligence and design defect must be dismissed for an additional reason: she has not alleged that there exists a feasible safer alternative method for the manufacture of HFCS.

Accordingly, Defendants' motions are granted and the complaint is dismissed.

### V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiff's motion for leave to amend her complaint (Docket No. 28) is GRANTED.

FURTHER, Defendants' motions to dismiss (Docket Nos. 21, 25), construed against the amended complaint, are GRANTED.

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      April 21, 2014
            Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Chief Judge
United States District Court

-17-

Case 1:13-cv-00634-WMS   Document 43   Filed 04/22/14   Page 1 of 1

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

### WESTERN DISTRICT OF NEW YORK

## JUDGMENT IN A CIVIL CASE
### CASE NUMBER: 1:13-CV-634S

S.F., as Parent and Natural Guardian of
S.E.F., an Infant
          v.

Archer-Daniels-Midland Company, et al

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that Plaintiff's motion for leave to amend her complaint is granted. Further, Defendants' motions to dismiss, construed against the amended complaint, are granted and this case is closed.

Date: April 22, 2014

                         MICHAEL J. ROEMER, CLERK


               By:   s/Deborah M. Zeeb
                     Deputy Clerk