# 14-1615-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

▶▶ ◀◀

S.F., as Parent and Natural Guardian of S.E.F., an infant,

*Plaintiff-Appellant,*

*v.*

ARCHER DANIELS MIDLAND COMPANY, CARGILL INC., INGREDION INC.,
TATE & LYLE INGREDIENTS AMERICAS, LLC, ROQUETTE AMERICA INC.,

*Defendants-Appellees,*

*and*

PENFORD PRODUCTS CORPORATION,

*Defendant.*

_____

*On Appeal from the United States District Court
for the Western District of New York*

## BRIEF FOR DEFENDANTS-APPELLEES ARCHER DANIELS MIDLAND COMPANY, CARGILL INC., INGREDION INCORPORATED AND TATE & LYLE INGREDIENTS AMERICAS, LLC

DAN K. WEBB
STEPHEN V. D'AMORE
SCOTT P. GLAUBERMAN
CORNELIUS M. MURPHY
WILLIAM P. FERRANTI

WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600
sdamore@winston.com

*Counsel for Defendants-Appellees
Archer Daniels Midland Company,
Cargill Inc., Ingredion Incorporated and
Tate & Lyle Ingredients Americas, LLC*

## CORPORATE DISCLOSURE STATEMENTS

Archer Daniels Midland Company is an Illinois corporation.  It has no parent corporation, and no publicly held company owns 10% or more of its stock.

Cargill, Inc. is a Delaware corporation.  It has no parent corporation and no publicly held company owns 10% or more of its stock.

Ingredion Incorporated is a Delaware corporation.  It has no parent corporation and no publicly held company owns 10% or more of its stock.

Tate & Lyle Ingredients Americas, LLC, is an Illinois limited liability corporation.  It operates as a subsidiary of Tate & Lyle plc.  No publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................iv

PRELIMINARY STATEMENT.............................................................1

COUNTERSTATEMENT OF ISSUES ................................................5

COUNTERSTATEMENT OF THE CASE..........................................6

    A.    High fructose corn syrup ................................................6

    B.    Plaintiff's diabetes and the foods allegedly responsible for it.....................................................................................9

    C.    Plaintiff's product liability claims................................11

    D.    Dr. Robert Lustig ...........................................................13

    E.    The district court's decision ..........................................19

SUMMARY OF ARGUMENT .........................................................22

ARGUMENT.....................................................................................26

I.    These Defendants cannot be sued for failure to warn, and Plaintiff is not challenging the district court's ruling that her negligence and design defect claims fail for lack of a safer alternative. ..................................................................................26

    A.    It is undisputed that the district court correctly dismissed Plaintiff's design defect and negligence claims for failure to plead a safer alternative.............................26

    B.    Defendants cannot be sued for failing to include warnings on products they did not sell. .......................................29

II.    Plaintiff's theory of causation is implausible. ........................................30

    A.    Given the numerous, well-known risk factors for diabetes, the assertion that consuming HFCS is the proximate cause of Plaintiff's diabetes is not plausible..............31

B.    Plaintiff's claims are not rendered plausible by her "food history," her conclusory assertions of mislabeling, or the facially flawed opinion of an "expert" acting as advocate, not physician. ................................35

    1.    The foods Plaintiff ate.............................................36

    2.    HFCS 90 and Crystalline Fructose.......................37

    3.    Dr. Lustig.................................................................39

III.    Food products are not "unreasonably dangerous" simply because excessive consumption may be unhealthy. .............................43

A.    The district court correctly ruled that Plaintiff has not plausibly pleaded that HFCS is unreasonably dangerous. ........................................................................................43

B.    The district court's ruling turns on neither the terminology in Plaintiff's complaint, nor the proposition that sucrose and HFCS are nutritionally equivalent. ........................................................................................45

IV.    Plaintiff may not rely on a theory of market share liability.................51

V.    Federal law preempts Plaintiff's claims. ...................................................57

A.    Federal law affirms that HFCS is safe. ...........................................57

B.    Federal law mandates the design of HFCS. ..................................62

CONCLUSION ...................................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aaronson v. Vital Pharm., Inc.*,
2010 WL 625337 (S.D. Cal. Feb. 17, 2010)....................................................59

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................................................36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................31, 32, 38, 40, 43

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) ...........................................................................51

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................24, 30, 31, 33

*Brenner v. Am. Cyanamid Co.*,
263 A.D.2d 165 (N.Y. App. Div. 1999)...................................4, 53, 54, 55, 56

*Cardinale v. Quorn Foods*,
2011 WL 2418628 (Conn. Super. Ct. May 19, 2011).....................................61

*Clinton v. Brown & Williamson Holdings, Inc.*,
498 F. Supp. 2d 639 (S.D.N.Y. 2007) .............................................................27

*Cook v. MillerCoors, LLC*,
872 F. Supp. 2d 1346 (M.D. Fla. 2012) ..........................................................44

*DaSilva v. Am. Tobacco Co.*,
175 Misc.2d 424 (N.Y. Sup. Ct. 1997).......................................................53, 54

*DiBartolo v. Abbott Labs.*,
914 F. Supp. 2d 601 (S.D.N.Y. 2012) .............................................................27

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).......................................................................................33, 34

iv

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990)....................................................................................57

*Ferracane v. United States*,
    2007 WL 316570 (E.D.N.Y. Jan. 30, 2007)..................................................27

*Fisher v. Miller*,
    -- F. App'x --, 2014 WL 3057326 (3d Cir. July 8, 2014)..............................28

*Giles v. A. Gi Yi*,
    105 A.D.3d 1313 (N.Y. App. Div. 2013)........................................................56

*Goldin v. Smith & Nephew*,
    2013 WL 1759575 (S.D.N.Y. Apr. 24, 2013)..................................................27

*Gorran v. Atkins Nutritionals, Inc.*,
    464 F. Supp. 2d 315 (S.D.N.Y. 2006)............................................................44

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222 (2001)....................................................................................53

*Homeless Patrol v. Joseph Volpe Family*,
    425 F. App'x 60 (2d Cir. 2011)......................................................................28

*Hymowitz v. Eli Lilly & Co.*,
    73 N.Y.2d 487 (1989).......................................................................52, 53, 55

*In re Great Lakes Dredge & Dock Co.*,
    624 F.3d 201 (5th Cir. 2010).........................................................................51

*In re New York Silicone Breast Implant Litig.*,
    631 N.Y.S.2d 491 (Sup. Ct. 1995),
    *aff'd* 234 A.D.2d 28 (N.Y. App. Div.).......................................................52, 53

*In re Rezulin Prods. Liab. Litig.*,
    441 F. Supp. 2d 567 (S.D.N.Y. 2006)...........................................................36

*LaBella Winnetka, Inc. v. Vill. of Winnetka*,
    628 F.3d 937 (7th Cir. 2010).........................................................................29

*Lovell v. GEICO Gen. Ins. Co.,*
    2013 WL 7871497 (W.D.N.Y. Mar. 29, 2013)..................................................35

*Mutual Pharm. Co. v. Bartlett,*
    133 S. Ct. 2466 (2013)..................................................57, 63, 64

*Pelman v. McDonald's Corp.,*
    237 F. Supp. 2d 512 (S.D.N.Y. 2003) ..................................................31, 34, 44

*Pelman v. McDonald's Corp.,*
    2003 WL 22052778 (S.D.N.Y. Sept. 3, 2003) ..................................................34

*Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005) ..................................................34

*Pinello v. Andreas Stihl Ag & Co. KG,*
    2011 WL 1302223 (N.D.N.Y. Mar. 31, 2011) ..................................................27, 44

*Polimeni v. Minolta Corp.,*
    227 A.D.2d 64 (N.Y. App. Div. 1997)..................................................29

*Ruggiero v. Warner-Lambert Co.,*
    424 F.3d 249 (2d Cir. 2005) ..................................................36

*Simpson v. Calif. Pizza Kitchen,*
    2013 WL 5718479 (S.D. Cal. Oct. 1, 2013)..................................................58

*Sindell v. Abbott Labs.,*
    26 Cal.3d 588 (1980) ..................................................55

*Truong v. Bank of Am., N.A.,*
    717 F.3d 377 (5th Cir. 2013)..................................................28

*Tuosto v. Philip Morris USA Inc.,*
    672 F. Supp. 2d 350 (S.D.N.Y. 2009) ..................................................51

*Voss v. Black & Decker Mfg. Co.,*
    59 N.Y.2d 102 (1983) ..................................................27

*Western Sugar Coop. v. Archer-Daniels-Midland Co.,*
    No. 11-CV-3473 (C.D. Cal. 2011) ..................................................16

## STATUTES, RULES, AND REGULATIONS

10 U.S.C. §505(a) ...................................................................................14

21 C.F.R. §101.9(c)(6)(ii) ........................................................................47

21 C.F.R. §170.3(i) ...............................................................8, 41, 58, 59

21 C.F.R. §184.1(a) ...................................................................7, 58, 60

21 C.F.R. §184.1866(a) .............................................................7, 62, 63

21 C.F.R. §184.1866(b) ...........................................................................62

21 C.F.R. §184.1866(c) .........................................................4, 8, 58, 63

Direct Food Substances Affirmed as Generally Recognized as
    Safe; High Fructose Corn Syrup,
    61 Fed. Reg. 43,447-01 (Aug. 23, 1996) ...........................7, 9, 59, 60

Fed. R. Civ. P. 8....................................................................................37

Food Labeling: Mandatory Status of Nutrition Labeling and
    Nutrient Content Revision, Format for Nutrition Label,
    58 Fed. Reg. 2,079-01 (Jan. 6, 1993) ...............................................48

## OTHER AUTHORITIES

1 N.Y. Prod. Liab. § 1:2 ......................................................................26

Erin Allday, *Dr. Robert Lustig Crusades Against Sugar*, S.F. GATE
    (Jan. 1, 2013), http://www.sfgate.com/health/article/Dr-
    Robert-Lustig-crusades-against-sugar-4160268.php .................15

Am. Diabetes Ass'n, http://www.diabetes.org/diabetes-
    basics/genetics-of-diabetes.html.................................................31

Sarah Boseley, *Sugar, Not Fat, Exposed as Deadly Villain in
    Obesity Epidemic*, THE GUARDIAN (Mar. 20, 2013),
    http://www.theguardian.com/society/2013/mar/20/sugar
    -deadly-obesity-epidemic ..............................................................14

*The Colbert Report* (Comedy Central television broadcast Mar. 28, 2013), http://the colbertreport.cc.com/videos/sliefv/robert-lustig ..............................18, 49

Monica Eng, *Author Dishes on Food Industry's Role in Obesity*, CHICAGO TRIB. (Jan. 16, 2013), http://articles.chicagotribune.com/2013-01-16/features/sc-food-0118-fat-chance-book-20130116_1_food-industry-obesity-crisis-fat-chance ...............................................................................17

Monica Eng, *Anti-sugar Doctor Robert Lustig Talks More About What's Wrong with the American Diet*, CHICAGO TRIB. (Jan. 17, 2013), http://articles.chicagotribune.com/2013-01-17/features/chi-food-policy-robert-lustig-dishes-on-low-carb-obama-toxic-sugar-juice-and-more-20130117_1_anti-sugar-food-industry-food-items ...................................................13

FDA, *High Fructose Corn Syrup: Questions & Answers* (*"HFCS: Q&A"*), http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm324856.htm................................7, 8, 9, 61

Tamar Haspel, *Is Sugar a Toxin?*, WASH. POST (Sept. 2, 2013), http://www.washingtonpost.com/national/health-science/is-sugar-a-toxin-experts-debate-the-role-of-fructose-in-our-obesity-epidemic/2013/08/30/58a906d6-f952-11e2-afc1-c850c6ee5af8_story.html.........................................................13

Robert H. Lustig, *et al.*, *Comment*, NATURE (Feb. 2, 2012) ................................14

ROBERT H. LUSTIG, FAT CHANCE (2012) .........................................................*passim*

Nat'l Diabetes Educ. Program, U.S. Dep't of Health & Human Services, *Diabetes Risk Factors*, http://ndep.nih.gov/am-i-at-risk/DiabetesRiskFactors.aspx ....................................................31

Nat'l Diabetes Information Clearinghouse, U.S. Dep't of Health & Human Services, *Causes of Diabetes*, http://diabetes.niddk.nih.gov/dm/pubs/causes/...............................................31

viii

N.Y. Assembly Bill 2865, 2013 Legislature ....................................................28, 53

Raphael Rosen, *Sweet Start for Center*, WALL ST. J. (Feb. 18, 2013),
http://online.wsj.com/news/articles/SB10001424127887323
9494045783123506487770828 ...........................................................................14

RESTATEMENT (SECOND) OF TORTS §402A cmt. i ...................................................44

RESTATEMENT (THIRD) OF TORTS §15(c) ...................................................................53

RESTATEMENT (THIRD) TORTS: PROD. LIAB. §2 cmt. j..........................................44

Karen Sloan, *Wielding the Law as a Weapon*, NAT'L L.J. (May 20,
2013),
http://www.nationallawjournal.com/id=1202600580093?
slreturn=20140618125747 ..................................................................................17

*Sugar: The Bitter Truth* (Univ. of Calif. Television broadcast July
30, 2009), http://youtube.com/watch?v=dBnniua6-oM ........18, 39, 42, 49

U.S. Department of Agriculture's National Nutrient Database
for Standard Reference, http://ndb.nal.usda.gov/ ...................................50

Elizabeth Weil, *Is Sugar the Next Tobacco?*, PAC. STANDARD (Dec.
27, 2012), http://www.psmag.com/navigation/health-and-
behavior/robert-lustig-sugar-obesity-diet-50948/ ....................................15

*Your Legal Rights* (NPR radio podcast May 22, 2013), http://
cpa.ds.npr.org/kalw/audio/2013/05/2013-May-22-18-59-
30-Your_Legal_Rights_0.mp3 ........................................................................17

## PRELIMINARY STATEMENT

Plaintiff seeks to blame a single ingredient in the nation's food sup-ply—high fructose corn syrup ("HFCS")—for her development of diabetes. But this is not plausible.  Diabetes is well-known to be associated with a variety of risk factors, including not only diet (which for any person contains a multitude of components), but also obesity, lifestyle, genetics, family background, and many other factors.  Plaintiff's principal argument on appeal is that the Court may not recognize that there are any other causes of diabetes because she did not allege it.  Yet diabetes has existed for thousands of years longer than HFCS, which was first made in the 1960s.  The diabetes risk factors are well-known.  The Court should decline Plaintiff's invitation to pretend otherwise.

In addition, even if the Court sets aside common sense and indulges the implausible contention that HFCS is uniquely to blame for Plaintiff's disease, the judgment of dismissal still should be affirmed.

*First*, Plaintiff does not challenge the district court's ruling that, as a matter of New York law, three of her four claims required pleading a less dangerous alternative, which she has not done.  And Plaintiff's fourth

claim, for failure to warn, fails for the simple reason that *Defendants sell nothing to consumers like Plaintiff and her mother*.

Plaintiff's opening brief tries to prop up her failure to warn claim with rants about food labels; the limits of FDA oversight; the supposed inability of "any consumer, or even any independent scientists … to discern the amount of fructose in any product being consumed"; and "industry … using our children and the population generally as a grand experiment." Br. 20-24. She adds that it is "both obvious and easy to see" that "consumers might be intentionally misled by labeling." *Id.* at 21. Even if all of this were true (it isn't), it cannot be laid at Defendants' feet. Plaintiff says: "The issue of warnings for Defendants' products is properly one for a jury's consideration." *Id.* But Plaintiff never bought "Defendants' products." Defendants make HFCS, which they sell exclusively wholesale to food manufacturers. Each of those food manufacturers makes its own decision whether to use HFCS in its products and in what amount. Those manufacturers are solely responsible for any warnings (or lack thereof) on the food Plaintiff ate.

*Second*, a food product is not unreasonably dangerous simply if it may, when consumed to excess, cause health problems. "As the Second

Restatement of Torts memorably puts it: 'good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks.'" SPA13-14 (citation omitted). Without disputing the principle, Plaintiff contends (again, without support) that HFCS is an "artificial, totally manmade product." Br. 17. But that is neither here nor there because the basis of Plaintiff's claim is that "'[f]ructose'—*not high-fructose corn syrup*—'is a major cause of metabolic syndrome and type 2 diabetes.'" SPA13 (quoting A159 ¶52). It is beyond reasonable dispute that apples, grapes, and figs are not unreasonably dangerous or defective products—and Plaintiff's complaint "does not distinguish between fructose found in fruit and fructose found in HFCS." *Id.*

*Third*, Plaintiff's complaint fails to make allegations against each Defendant individually. Plaintiff concedes that this is true. She also concedes that such "group pleading" is insufficient to state a claim *unless* New York law would permit her to invoke the doctrine of market share liability. But New York law does not give Plaintiff that shortcut. As the district court recognized, this case differs in several critical respects from those very few cases where market share liability has been allowed. For example, the New York Appellate Division held the doctrine inapplicable to claims against

3

manufacturers of the lead in lead paint on the ground that the consumer product itself (the paint) is not fungible. *Brenner v. Am. Cyanamid Co.*, 263 A.D.2d 165, 171 (N.Y. App. Div. 1999). So too here. The consumer products are the foods, not the HFCS, and the foods are not fungible.

*Fourth*, Plaintiff's claims are preempted. Plaintiff contends that HFCS is "toxic," but FDA has determined it is "safe"—that it is no different in safety from sugar or honey and poses no special risk even to people who are diabetic. FDA allows HFCS to be used in food "*with no limitation* other than current good manufacturing practice." 21 C.F.R. §184.1866(c) (emphasis added). And while Plaintiff claims that the fructose in HFCS makes it unsafe, federal law *requires* HFCS to include a specific amount of fructose.

Unless and until FDA rewrites the Code of Federal Regulations, HFCS is safe as a matter of federal law. Plaintiff's expert—America's self-appointed anti-sugars czar, Dr. Robert Lustig—counters, "Petitions [to FDA] don't work. Lawsuits do." ROBERT H. LUSTIG, FAT CHANCE 253 (2012). This lawsuit may "work" in the sense of garnering publicity for Dr. Lustig. But as a matter of New York law, federal pleading standards, and the Constitution's Supremacy Clause, the claim that manufacturers of HFCS may be held liable for Plaintiff's diabetes is entirely devoid of merit.

4

## COUNTERSTATEMENT OF ISSUES

Whether the judgment of dismissal with prejudice should be affirmed for any of the following reasons:

I.    Plaintiff waived in her opening brief any challenge to the district court's dismissal of three of her four claims for failure to plead a feasible alternative to HFCS, as New York Law requires, and her fourth claim (failure to warn) is untenable because these Defendants do not manufacture or sell any consumer food product, have no control over the composition of such products, and have no ability to provide warnings on packages (such as ketchup bottles or soda cans) made and sold by someone else.

II.    Plaintiff has not plausibly pleaded that HFCS uniquely, rather than some combination of the many well-known risk factors, is the proximate cause of her diabetes.

III.    Plaintiff has not plausibly pleaded that HFCS is unreasonably dangerous given (A) the general rule that a food product is not unreasonably dangerous simply if it may cause health problems when consumed to excess, and (B) the basis of her claim is that the naturally occurring sugar, fructose—not HFCS as such—is unhealthy.

5

IV.    Plaintiff may not use the doctrine of market share liability to excuse her undisputed failure to make allegations against any Defendant individually, where, among other things, the food products eaten by Plaintiff are not fungible, there has been no legislative action to facilitate claims related to HFCS, type 2 diabetes is not a "signature injury" caused solely by HFCS, and Defendants do not have exclusive control over the supposed risk of harm from HFCS, which is primarily controlled by food manufacturers who decide how much HFCS to include in consumer products.

V.    Plaintiff's claims are preempted because federal law (A) holds that HFCS is "safe," thereby foreclosing any claim that it is a "toxin" as a matter of state law; and (B) mandates the design of HFCS.

## COUNTERSTATEMENT OF THE CASE

### A.    High fructose corn syrup

Plaintiff alleges that high fructose corn syrup was first integrated into the American food supply in the 1970s.  A155 ¶21.[1]  It is a sweet aqueous solution derived from corn—and, more precisely, a combination of the simple sugars glucose and fructose.  A156 ¶24.  Fructose itself is a naturally

---

[1] Unless otherwise noted, citations and references to Plaintiff's "complaint" are to her Amended Complaint (A152-174), which the district court granted leave to file but dismissed (SPA17), as explained below.

occurring compound found in a wide variety of fruits, such as apples, grapes, pears, and figs. FDA, *High Fructose Corn Syrup: Questions & Answers*, http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm324856.htm, and in the record at A64 (hereinafter "*HFCS: Q&A*").

The two types of HFCS commonly used in food and beverages in the United States are "HFCS 42" and "HFCS 55." *HFCS: Q&A.* Federal law requires HFCS 42 to contain 42 percent fructose, and HFCS 55 to contain 55 percent fructose, with the remainder glucose and water. 21 C.F.R. §184.1866(a). The words "High Fructose" were intended to distinguish ordinary corn syrup, which is pure glucose. *HFCS: Q&A.* HFCS is not "high" in fructose compared to other dietary sources of fructose, such as apples or pears.

Following an eight-year review and assessment, FDA ruled that HFCS is "generally recognized as safe (GRAS)." 21 C.F.R. §184.1(a); *see generally* Direct Food Substances Affirmed as Generally Recognized as Safe; High Fructose Corn Syrup, 61 Fed. Reg. 43,447-01 (Aug. 23, 1996). "Safe" means that "there is a reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended conditions of

7

use." 21 C.F.R. §170.3(i). Accordingly, HFCS 42 and 55 may be used as an "ingredient ... in food *with no limitation* other than current good manufacturing practice." *Id.* §184.1866(c) (emphasis added).

FDA's position remains the same today. Answering the question, "**Is HFCS less safe than other sweeteners?**," FDA advises:

> FDA receives many inquiries asking about the safety of HFCS, often referring to studies about how humans metabolize fructose or fructose-containing sweeteners. These studies are based on the observation that there are some differences between how we metabolize fructose and other simple sugars.
>
> We are not aware of any evidence, including the studies mentioned above, that there is a difference in safety between foods containing HFCS 42 or HFCS 55 and foods containing similar amounts of other nutritive sweeteners with approximately equal glucose and fructose content, such as sucrose, honey, or other traditional sweeteners. The 2010 Dietary Guidelines for Americans recommend that everyone limit consumption of all added sugars, including HFCS and sucrose. FDA participated in the development of the Dietary Guidelines and fully supports this recommendation.

*See HFCS: Q&A.*

As this FDA guidance notes, there is nothing unusual about a sweetener that is a blend of roughly equal parts fructose and glucose. Sucrose—table sugar—is a mix of fructose and glucose in "an exact one-to-one ratio." *HFCS: Q&A.* Honey, too, has "an approximately one-to-one ratio of fruc-

tose to glucose." *Id.*; *see also* 61 Fed. Reg. at 43,447-49 (the "glucose to fructose ratio[] of HFCS is approximately the same as that of honey, invert sugar, and ... sucrose").

In addition to HFCS 42 and HFCS 55, Plaintiff's complaint references HFCS 65, HFCS 90, and Crystalline Fructose. HFCS 65 does not exist. HFCS 90 is approximately 90% fructose. Crystalline Fructose is essentially pure fructose. As discussed below, however, while Plaintiff speculates that she could have consumed HFCS 90 and Crystalline Fructose, she concedes that "there was and is no way" to know if she did. A163 ¶70.

### B.    Plaintiff's diabetes and the foods allegedly responsible for it

Plaintiff, identified as "S.E.F.," is 14 years old and lives with her mother, "S.F.," in New York. A152  ¶4. She has type 2 diabetes. In her original Complaint, she alleged that she "unknowingly consumed foods in many forms" but did not know "which food products contained" HFCS. A23 ¶70; A22 ¶65. Yet she blamed her diabetes on eating those unidentified foods and the HFCS they might have contained. A23-26 ¶¶ 68, 73, 76, 81.

In her amended complaint, Plaintiff added an affidavit from her mother, S.F., providing a list of foods that Plaintiff ate "in quantity and

regularly" and that S.F. "only recently learned contained HFCS."   A292

¶¶ 3, 5.  They are the following:

- *Candies*: Marshmallow Peeps (yellow), M&Ms, jet-puffed marsh-mallows, 3 Musketeer candy bar, Reese's Peanut Butter Cups, and Wegmans Gummy Worms.

- *Ice creams*: Turkey Hill ice cream, Perry's ice cream, Klondike Ice Cream Bars (original), and Carvel Ice Cream Cake Celebration.

- *Cookies*: Chips Ahoy Cookies, Stauffer's Animal Crackers (iced), Gerber Graduates Toddler Cereal Bars and Arrow Root Cookies.

- *Canned pastas*: Chef Boyardee Beef Ravioli, and Campbell's Spa-ghetti O's (with meatballs, original, and sliced franks).

- *Miscellaneous*: Heinz Ketchup, Yoplait Yogurt, Schwebels Country Hearth Health Home-style Bread (100 percent whole wheat), and thousand island salad dressing.

- *Chips and crackers*: Doritos (Cool Ranch flavor), Pringles (Original flavor reduced fat), Rold Gold Pretzels, and Keebler Sandwich Crackers (toast and peanut butter flavor).

- *Sodas*: Coke, Pepsi, and Sprite.

*Id*. ¶5.   Elsewhere in her affidavit, S.F. mentions hamburger buns at

McDonald's and Burger King, as well as Chicken McNuggets and their

sauces at McDonald's.  A294 ¶8.  On the subject of food labels, she admits

"I am certainly capable of reading labels."  A294 ¶10.

In fact, however, reading labels shows that *almost half these foods con-tain no HFCS*—although many of them contain other sweeteners such as

10

sugar (another source of dietary fructose), corn syrup (a solution of pure glucose that is not the subject of any claim in this case), and the like.  *See* A350-53.

### C.    Plaintiff's product liability claims

Having eaten these foods and developed diabetes, Plaintiff brought four product liability claims (strict liability, negligence, gross negligence, and failure to warn) against five manufacturers of HFCS (Defendants Archer Daniels Midland Company, Cargill, Inc., Ingredion Incorporated, Tate & Lyle Americas LLC, and Roquette America Inc.).  A165-72 ¶¶ 78-105.  Plaintiff does not allege that Defendants manufacture, package, or sell any of the food she consumed.  Rather, she seeks over $5 million from Defendants simply for making HFCS—just one source of fructose that food manufacturers may use in *their* products as *they* see fit.  A168¶ 92; A172 ¶105.

Plaintiff claims that consumption of HFCS is a substantial cause of her diabetes.  A168 ¶92.  She alleges that fructose is metabolized differently in the liver than glucose, and that this can lead to insulin resistance.  A156 ¶28.  According to Plaintiff, fructose "by-passes the insulin-driven satiety system, suppressing the 'degree of satiety' that would normally result from

a meal of glucose or sucrose." A157 ¶35. In other words, according to Plaintiff, the fructose in HFCS does not cause one to feel full, thereby "causing and contributing to over consumption on a chronic basis with the adverse effects therefrom including the development of type 2 diabetes." *See* A15 ¶¶ 27-28 (original complaint). Thus, Plaintiff concludes: "Fructose is a major cause of metabolic syndrome and Type 2 diabetes." A159 ¶52.

In support of these contentions, Plaintiff submitted with her amended complaint an affidavit from her attorney, placing before the district court the following documents related to HFCS:

- Exhibits A and B (A81-87): printouts from the Archer Daniels Midland website showing that HFCS 90 and Crystalline Fructose exist, along with certificates showing that Crystalline Fructose is Halal, and HFCS and Crystalline Fructose are Kosher (*i.e.*, observant Muslims and Jews may eat them).

- Exhibits C, D, and E (A88-138): documents from a 1997 Mexican anti-dumping dispute. While Plaintiff contends that they show a difference between HFCS and sucrose (Br. 9-10), nothing in these documents suggests any difference between the fructose in HFCS and the fructose in other dietary sources, such as sugar.

- Exhibit F (A139-143): an article about HFCS, triglycerides, and uric acid, which states in pertinent part: "The data suggest that HFCS yields similar metabolic responses to other caloric [that is, calorie-bearing] sweeteners such as sucrose [sugar]. ... HFCS does not seem to be any more insidious than other caloric sweeteners."

- Exhibit G (A144-150): a study of obesity (not diabetes) in rats (not humans).

12

### D.    Dr. Robert Lustig

With her amended complaint, Plaintiff submitted the documents and information about her diet discussed above.  But the real revelation was the disclosure of her "expert," Dr. Robert Lustig—a self-proclaimed "firebombing" crusader against *all* forms of sugars, not just HFCS.

Dr. Lustig proclaims, "Sugar is a toxin.  Plain and simple."  FAT CHANCE at 127; *see also id.* at 257.  For Star Wars fans, he explains sugars are "the Darth Vader of the Empire"; Superman partisans should think of sugars as "Lex Luthor."  *Id.* at 20-21, 118.  Dr. Lustig seeks to have sugars replace other recent food villains, such as fat, carbohydrates, animal products, cooked food, and gluten.[2]  He advises that "100 percent orange juice is worse for you than soda," because the orange juice contains a miniscule additional amount of fructose.  *Id.* at 119.[3]  He wants to impose by law an age requirement of 17 on purchases of sugared drinks, such as juice, soda,

---

[2] Tamar Haspel, *Is Sugar a Toxin?*, WASH. POST (Sept. 2, 2013), http://www.washingtonpost.com/national/health-science/is-sugar-a-toxin-experts-debate-the-role-of-fructose-in-our-obesity-epidemic/2013/08/30/58a906d6-f952-11e2-afc1-c850c6ee5af8_story.html.

[3] *See also* Monica Eng, *Anti-sugar Doctor Robert Lustig Talks More About What's Wrong with the American Diet*, CHICAGO TRIB. (Jan. 17, 2013), http://articles.chicagotribune.com/2013-01-17/features/chi-food-policy-robert-lustig-dishes-on-low-carb-obama-toxic-sugar-juice-and-more-20130117_1_anti-sugar-food-industry-food-items.

sports drinks, and chocolate milk.[4]  The nation's young would have to wait until they are old enough to enlist in the Army, 10 U.S.C. §505(a), before they could buy apple juice or Yoo-hoo.

Dr. Lustig believes that all sugars are addictive, toxic, and deadly.[5] He blames sugars for "the biggest public health crisis in human history. It's bigger than the bubonic plague, the flu, and AIDS."[6]  To put that claim into context, consider that the Black Death is estimated to have killed 30 to 60 percent of the population of Europe.  The flu in just one year, 1918, killed up to 100 million people.  Dr. Lustig again: "Sugar is the most destructive force in the universe."[7]

---

[4] Robert H. Lustig, *et al.*, *Comment*, NATURE (Feb. 2, 2012), at 29.

[5] Sarah Boseley, *Sugar, Not Fat, Exposed as Deadly Villain in Obesity Epidemic*, THE GUARDIAN (Mar. 20, 2013), http://www.theguardian.com/society/2013/mar/20/sugar-deadly-obesity-epidemic.

[6] Raphael Rosen, *Sweet Start for Center*, WALL ST. J. (Feb. 18, 2013), http://online.wsj.com/news/articles/SB10001424127887323949404578312350648770828.

[7] *Id.*  The article reports Dr. Lustig delivering this line as a "stern message." But he appears to have been parroting movie dialog between Tommy Lee Jones (as Agent K) and Will Smith (as Agent J) in the comedy *Men in Black 3*, which was in theaters shortly before Dr. Lustig's comment.  In the movie, K asks J, "What's the most destructive force in the universe?"  J jokes, "Sugar?"  It is not a reference to fructose.  In the first *Men in Black* movie, Earth was invaded by an alien known as the "Bug," who craved sugar. The true most destructive force in the universe, K tells J, is "Regret."

It is fair to wonder how Dr. Lustig reached that remarkable conclusion.  The San Francisco Chronicle has the story:

> Lustig, like pretty much every other pediatrician in the country, had noticed an alarming increase in obesity among his young patients.  *But it wasn't until 2006, when he was asked to speculate during a medical conference about possible environmental causes behind obesity, that he hit on sugar.*
>
> *For argument's sake, Lustig suggested that fructose* - a simple sugar that is naturally occurring in fruits, but also is being pumped into a huge variety of processed foods for taste and preservation - *is an environmental toxin.*
>
> *"They wouldn't let me off the dais after the talk," Lustig said.*[8]

The lesson must have been clear: speculating that a common food ingredient is to blame for all of society's woes is a terrific way to get attention.

Since that 2006 conference, Dr. Lustig has exhibited a "taste for grandstanding."[9]  As he described his approach, "I get up and throw firebombs into the middle of the room."  *Id.*  No doubt this helps him gain

---

[8] Erin Allday, *Dr. Robert Lustig Crusades Against Sugar*, S.F. GATE (Jan. 1, 2013), http://www.sfgate.com/health/article/Dr-Robert-Lustig-crusades-against-sugar-4160268.php (emphasis added).

[9] Elizabeth Weil, *Is Sugar the Next Tobacco?*, PAC. STANDARD (Dec. 27, 2012), http://www.psmag.com/navigation/health-and-behavior/robert-lustig-sugar-obesity-diet-50948/.  Grandstanding aside, Dr. Lustig "hasn't done much original research on this topic, which drives his endocrinology colleagues crazy.  His sloppy errors leave experts wanting to, as one [said], 'stick knitting needles' in their eyes."  *Id.*

publicity and sell books; FAT CHANCE was a *New York Times* bestseller.[10]

Now Dr. Lustig has turned his efforts to the courts. A comparison of his affidavit and book to Plaintiff's two complaints strongly suggests that this lawsuit is a thinly disguised front for Dr. Lustig's anti-sugars campaign.[11] *See* A332. It seems that this case has finally given Dr. Lustig an opportunity to test his recommendation that "lawsuits are a great way to get the food industry and the government's attention ...." FAT CHANCE at 250. He plans to "us[e] the judiciary to ... moderate sugar consumption" (*Is Sugar the Next Tobacco?*, *supra*) because "[FDA] petitions don't work. Lawsuits do." FAT CHANCE at 253. Because he disparages FDA as having been

---

[10] *See* http://nytimes.com/best-sellers-books/2013-01-27/hardcover-advice/list.html.

[11] Paragraphs 17, 18, 19, 20, 22, 23, 25, 26, 28, 30, 34, 35, 36, 38, 41, and 42 of the original Complaint are lifted directly from Dr. Lustig's affidavit, typically word for word. The Amended Complaint was either written by Dr. Lustig or in mimicry of him, with paragraphs 21, 22, 23, 24, 25, 26, 27, 28, **29**, 30, 31, **32**, **33**, 34, 35, 36, **37**, 38, **39**, 40, 41, **42**, 43, 44, **45**, **46**, **47**, 48, **49**, **50**, **51**, 52, 66, 67, and 71 all lifted from his affidavit. The paragraph numbers shown in bold are also lifted, in whole or part, from Dr. Lustig's book FAT CHANCE at 38-45, 123-28. Much of the rest of the complaint and amended complaint were lifted from the amended complaint in a Lanham Act lawsuit filed by the sugar industry against the HFCS industry, *Western Sugar Coop. v. Archer-Daniels-Midland Co.*, No. 11-CV-3473 (C.D. Cal. 2011).

"co-opted," he pursued a Master of Studies in Law degree[12] so that he could "learn the tobacco playbook"[13] and "start making some headway."[14]

In May 2013, Dr. Lustig formed an organization called the "Institute for Responsible Nutrition." One of its explicitly stated purposes was to "engage plaintiffs expected to file prolific litigation against the food industry in the next 2-3 years, including: individuals …."[15] This lawsuit was filed a month later.

---

[12] The MSL is a two-semester program at the University of California at Hastings that teaches students the "leverage points in the law where you can have the most influence in your field" without becoming a practicing lawyer. The Master of Studies in Law, http://uchastings. edu/academics/grad-division/msl-program/index.php. Dr. Lustig was a member of the program's very first class. Karen Sloan, *Wielding the Law as a Weapon*, NAT'L L.J. (May 20, 2013), http://www.nationallaw journal.com/id=1202600580093?slreturn=20140618125747.

[13] *Your Legal Rights* at 26:13 (NPR radio podcast May 22, 2013), http://cpa .ds.npr.org/kalw/audio/2013/05/2013-May-22-18-59-30-Your_Legal_ Rights_0.mp3.

[14] Monica Eng, *Author Dishes on Food Industry's Role in Obesity*, CHICAGO TRIB. (Jan. 16, 2013), http://articles.chicagotribune.com/2013-01-16/ features/sc-food-0118-fat-chance-book-20130116_1_food-industry-obesity-crisis-fat-chance.

[15] INSTITUTE FOR RESPONSIBLE FOODS: ABOUT US, http://web.archive.org/ web/20131220011523/http://responsiblefoods.org/news/about-us. According to the website's Founders page, Dr. Lustig is the Institute's president. The Institute also "aim[s] to supply information to plaintiff attorneys suing the food industry." *Wielding the Law, supra.* At some point after Defendants' brief brought the "prolific litigation" quote to the district court's attention, it appears to have been purged from Dr. Lustig's website.

17

Supporting Plaintiff's amended complaint, Dr. Lustig's affidavit asserts that after "personally review[ing] all of the extant medical records for the infant" and based on "the Affidavit of the child's mother, S.F., which attests to many of the foods that the infant consumed … that contained HFCS," he is ready to declare "with reasonable medical and scientific certainty" that HFCS was a significant cause of Plaintiff's diabetes.  A204 ¶6, A212 ¶50.  He does not account for the errors in Plaintiff's mother's affidavit, discussed above.  He does not identify or describe the "extant medical records."  He does not claim to have ever examined Plaintiff herself.

Dr. Lustig also does not address his oft-expressed view that "HFCS and sucrose are, for all intents and purposes, biochemically and metabolically equivalent."  FAT CHANCE at 166; *see also, e.g.*, *id*. at 169 ("HFCS is no worse for your health than any other forms of fructose"); *Sugar: The Bitter Truth* at 18:52 (Univ. of Calif. Television broadcast July 30, 2009), http://youtube.com/watch?v=dBnniua6-oM ("High fructose corn syrup.  Sucrose.  It's a non-issue.  It's a wash.  They're the same....."); *id*. at 1:26:01 ("[F]ructose, and I don't care what the vehicle is, it's irrelevant, sucrose or high fructose corn syrup, I don't care."); *The Colbert Report* at 3:35 (Comedy Central television broadcast Mar. 28, 2013), http://thecolbertreport.cc.com

18

/videos/sliefv/robert-lustig ("All the data says that high fructose corn syrup and sucrose, table sugar, cane sugar, beet sugar, the stuff you put in coffee, are exactly the same.").

### E.    The district court's decision

The district court granted Plaintiff leave to file the Amended Complaint, but correctly found that even as amended her claims had several fatal problems.

The district court began by questioning the plausibility of Plaintiff's contention that HFCS uniquely caused her diabetes.  Exercising common sense, the court pointed out, "Type 2 diabetes is a multifactorial disease.  It can be caused by, for example, a lack of exercise, genetics, or poor diet—or some combination of several factors.  No expert opinion is required to arrive at this conclusion."  SPA7.  The court continued, "aside from idly listing various common foods she has eaten, Plaintiff offers limited facts that might lead this Court to believe that she could ultimately show that it was her consumption of these foods, and specifically the HFCS found within these foods (manufactured by these defendants) that led to her disease." *Id.* "It may be possible that HFCS caused Plaintiff to develop Type 2 diabetes, but (based on the facts in the complaint) is it plausible?"  SPA8.  The

district court found it unnecessary to definitively answer this question of proximate cause because, "even assuming Plaintiff could surpass this hurdle, her claims fail for other reasons."  SPA9.

*First*, the court held that New York law would not permit Plaintiff to proceed on a theory of "market share liability."  Plaintiff did not dispute that she had engaged in group pleading or that this typically is impermissible.  Rather, she proposed that each Defendant could be presumed liable to the extent of its share of the market.  As the district court explained, however, market share liability is rarely appropriate and several of the factors necessary for its use are not present here.  SPA9-12.

*Second*, the district court held that Plaintiff failed to plead that HFCS is an unreasonably dangerous product.  It is an "uncontested fact" that Defendants "do not control how much HFCS is used in the finished products that Plaintiff consumed."  SPA14.  Accordingly, Plaintiff's theory has to be that HFCS is (as she says) "toxic"—*per se* unsafe, in any amount.

The problem, however, is that Plaintiff "does not distinguish between fructose found in fruit and fructose found in HFCS."  SPA13.  She alleges that "'[f]ructose'—*not high-fructose corn syrup*—'is a major cause of metabolic syndrome and type 2 diabetes."  *Id.* (quoting A159 ¶52).  But fructose "is

20

a naturally occurring compound, found in everyday, commonly-consumed fruits like grapes and pears"—and "[i]f there is no difference between HFCS and simple fructose, HFCS can hardly be said to be unreasonably dangerous." *Id.*[16] "[M]any products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption." SPA14 (quoting RESTATEMENT (SECOND) OF TORTS §402A cmt. i).

*Third*, the district court held that Plaintiff's negligence and design-defect claims fail for the additional reason that Plaintiff failed to plead a safer alternative. *See* SPA14-16. This omission is consistent with Plaintiff's allegations (implausible though they are) that fructose is "toxic" such that "all HFCS—even those formulations with a lower fructose-to-glucose ratio than sugar—is unsafe, regardless of its composition." SPA15. But it is fatal to her negligence and design-defect claims because New York law requires, as an element of such claims, that "it was feasible to design the product in a

---

[16] In her appeal brief, Plaintiff quotes this line with a "sic," as if the district court meant to compare HFCS not to fructose, but to "sucrose/sugar." Br. 8, 9, 10. Plaintiff is mistaken. The district court said exactly what it meant: Plaintiff's claims fail because her allegations and arguments made clear that the concern is *fructose*—and there is no allegation (nor any basis to allege) that the fructose in HFCS is any different from any other fructose.

safer manner." *Id.* (citation omitted).  Plaintiff "does not attempt to allege how HFCS could be made safer," but, as a matter of New York law, "if the only alternative is an outright ban, no design-defect claim will stand." SPA16.

Accordingly, and with Plaintiff having made no request to further replead, the district court dismissed with prejudice.  Plaintiff appeals.

## SUMMARY OF ARGUMENT

The judgment should be affirmed for five separate reasons.

I.     Plaintiff asserted four product liability claims under New York state law.  The district court dismissed Plaintiff's negligence, gross negligence, and design defect claims because Plaintiff failed to plead a safer alternative, as New York law requires.  Plaintiff has not challenged this ruling (nor may she do so for the first time in reply), so her appeal must fail with regard to those three claims.

Plaintiff's fourth claim—failure to warn her of HFCS's supposed dangers—is plainly misplaced because Defendants sell HFCS to food companies, not to consumers like Plaintiff and her mother.  Those food companies may choose to use HFCS or not, in whatever amount *they* see fit, as one ingredient among many in *their* foods.  Defendants have neither the

ability nor the obligation to put warning labels on products sold by someone else.

II.     The judgment also should be affirmed on the ground that Plaintiff failed to plausibly allege that her type 2 diabetes was caused by her consumption of HFCS.  A complaint must be dismissed if it lacks factual allegations plausibly showing that the defendant's unlawful conduct, rather than some other cause, is responsible for the plaintiff's injury.  Plaintiff's complaint fails to meet this standard.  Diabetes is well-known to be associated with a variety of risk factors, including diet, obesity (which itself is tied to type and amount of food eaten, levels of physical activity, genetics, and metabolism), genetics (including family history), family background in certain groups, and many other factors.  It is implausible that just one ingredient (HFCS), implicating just one factor (diet)—and no other sugars, no other foods, and no other factors—caused Plaintiff's diabetes.

On appeal, Plaintiff contends that Defendants have not shown that there are any causes of diabetes besides HFCS.  But of course there are.  HFCS was first made in the 1960s; diabetes has existed for millennia.  Plaintiff may have eaten some unidentified amount of HFCS in various foods at various times, and she may now be diabetic, but that does not plausibly

23

show, as *Twombly* requires, that one caused the other. Millions of people eat HFCS every year without becoming diabetic.

III.    Any food consumed in excess can, over time, have ill effects on the body—a fact known long and well to American consumers. A person's decision to eat too many calories or too much of a common ingredient such as sugars does not render food unreasonably dangerous and cannot create liability for the ingredient's maker. Plaintiff tries to sidestep this principle by characterizing HFCS as a uniquely dangerous sweetener—a "toxin." Yet she does not deny that the forms of HFCS commonly used in foods and beverages in the United States contain roughly the same amount of fructose as sugar or honey. Indeed, all of these are treated as "Sugars" and disclosed cumulatively on the familiar FDA-mandated nutrition facts panel.

What is more, as the district court recognized, Plaintiff's allegations are ultimately about *fructose*. Her complaint alleges that "'[f]ructose'—*not high-fructose corn syrup*—'is a major cause of metabolic syndrome and type 2 diabetes.'" SPA13 (quoting A159 ¶52). Plaintiff does not claim that the fructose from HFCS is metabolized differently from the fructose from any other dietary source. In addition, as the district court highlighted, Defendants are not in control of how much HFCS or other ingredients food manu-

24

facturers use in their products.  SPA14.  If Plaintiff's diabetes resulted in some part from eating too many calories or sugars, or even too much fructose in particular, Defendants are not to blame.

IV.    Another ground for affirmance is that Plaintiff may not proceed against the HFCS industry on a theory of market share liability.  By imposing liability without regard for whether a given plaintiff was injured by a defendant's own product, that theory jettisons fundamental tort law principles of causation and duty.  Accordingly, the New York courts have held as a matter of state law that the theory is available only in rare circumstances—as when the legislature specifically acts to facilitate a particular type of claim, when the product in question is uniquely associated with a "signature injury," and when the defendants have "exclusive control" over the product.  As the district court recognized, that is not the situation here.

V.    Finally, Plaintiff's claims are preempted by federal law—not once, but twice.  First, Plaintiff claims that HFCS is "a toxin" that is unreasonably dangerous as a matter of New York law.  Under federal law, however, HFCS is "safe" and may be used in food without limitation.  These are mutually exclusive propositions—and the Supremacy Clause dictates that state law give way.

25

Second, federal law mandates the design of HFCS, including the amount of fructose it contains. Plaintiff may not argue that New York law should impose a different standard. If it did, manufacturers would be in an impossible position. They cannot include 55% fructose in HFCS 55, as federal law requires, and at the same time some lesser amount of fructose (or none at all), as Plaintiff apparently proposes.

For any or all of these reasons, the judgment should be affirmed.

## ARGUMENT

### I.    These Defendants cannot be sued for failure to warn, and Plaintiff is not challenging the district court's ruling that her negligence and design defect claims fail for lack of a safer alternative.

#### A.    It is undisputed that the district court correctly dismissed Plaintiff's design defect and negligence claims for failure to plead a safer alternative.

Plaintiff asserted four claims under New York product liability law: design defect,[17] negligence, gross negligence, and failure to warn. As the district court ruled, it is fatal to Plaintiff's design defect and two negligence claims that she has not alleged a safer alternative design. *See* SPA14-16 (cit-

---

[17] This is pleaded as a claim for "strict liability." A manufacturer may be strictly liable for a product that has a manufacturing defect, a design defect, or an inadequate warning. 1 N.Y. Prod. Liab. §1:2. Plaintiff has not alleged that HFCS is defectively manufactured. And because she alleged a separate claim for failure to warn, Defendants and the district court construed her strict liability claim as asserting defective design. *See* SPA14-15.

ing, *inter alia*, *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 109 (1983); *DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 621, 623 (S.D.N.Y. 2012)); *see also Ferracane v. United States*, 2007 WL 316570, *5 (E.D.N.Y. Jan. 30, 2007) (for a design defect claim, a plaintiff must show that "it was feasible to design the product in a safer manner and that the proposed design would have prevented some of plaintiff's injuries") (quotation marks and citation omitted); *Pinello v. Andreas Stihl Ag & Co. KG*, 2011 WL 1302223, *11 (N.D.N.Y. Mar. 31, 2011) ("New York courts generally consider strict products liability and negligence claims to be 'functionally synonymous.'") (citation omitted); *Goldin v. Smith & Nephew*, 2013 WL 1759575 (S.D.N.Y. Apr. 24, 2013) (failure to plead the existence of a feasible alternative design requires dismissal).

The district court acknowledged that "Plaintiff might be suggesting that HFCS should not be used at all, and that sugar ought to be used in its place," but correctly ruled that this would be untenable under New York law: "such an 'imposition of state law tort liability on the manufacture and sale of [HFCS] now on the market' would constitute 'a virtual ban on [HFCS].... This is exactly the type of claim that *Voss*'s alternative feasible design requirement was meant to disallow.'" SPA16 (quoting *Clinton v.*

*Brown & Williamson Holdings, Inc.*, 498 F. Supp. 2d 639, 648 (S.D.N.Y. 2007)).[18]

Plaintiff has not challenged this ruling. Her opening brief discusses "safer alternatives" only with respect to failure to warn. *See* Br. 23-24. But no one, including the district court, said that failure to warn requires identification of a safer alternative. Rather, as the district court explained, this is a requirement for design defect and negligence claims. SPA14-16.

An appellant's opening brief may not ignore a stated basis for the district court's decision. Doing so waives any challenge to the ruling. *Homeless Patrol v. Joseph Volpe Family*, 425 F. App'x 60, 61 (2d Cir. 2011) ("because [appellant's] arguments on appeal fail to address the district court's bases for dismissing his claims …, [appellant] has waived any such challenge"); *Fisher v. Miller*, -- F. App'x --, 2014 WL 3057326, *1 (3d Cir. July 8, 2014) ("[Appellant] does not address the grounds on which the District Court dismissed his complaint. Issues not raised in an opening brief are waived on appeal."); *Truong v. Bank of Am., N.A.*, 717 F.3d 377, 386 (5th Cir. 2013) ("[Appellant] does not address the District Court's holding in her opening

---

[18] Such a claim would also run afoul of the New York legislature's rejection of a proposed anti-HFCS bill. N.Y. Assembly Bill 2865, 2013 Legislature.

brief. [The issue] is therefore waived."); *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943 (7th Cir. 2010) (same).

### B.    Defendants cannot be sued for failing to include warnings on products they did not sell.

Plaintiff's only other claim is that she was not warned about HFCS's supposed danger. But she never purchased any product from Defendants, and she neither alleges any facts nor cites any authority to support the notion that Defendants are responsible for the warnings (or lack thereof) on other companies' products and packaging. Nor are they. New York law does not, for example, make Cargill responsible for any warning (or lack thereof) on cans sold by Coca-Cola. *E.g.*, *Polimeni v. Minolta Corp.*, 227 A.D.2d 64, 66 (N.Y. App. Div. 1997) ("the immediate distributor is in a better position to warn the ultimate consumer of the dangers associated with the finished product"; "to require the bulk manufacturer to issue warnings through the entire chain of distribution would be too onerous a burden").

Plaintiff asserts, without explanation, that the foods she ate were sometimes misleadingly labeled as containing sugars other than HFCS. Br. 20; A293-294 ¶¶ 6-8. She also complains that the district court failed to "recognize that the labels and (non-existent) warnings on food products al-

so fail to list and identify actual ingredients such as fructose 90% and crystalline fructose 99.9%." Br. 21 (citing nothing).

Even setting aside the problem that federal labeling laws pose for such arguments, and the fact that Plaintiff's complaint alleges *nothing* to back up these allegations of mislabeling, the problem remains that Defendants cannot be held responsible for the alleged mislabeling. HFCS is simply an ingredient that may be included in foods—just like flour or baking powder. Ingredient suppliers such as Defendants have neither the ability nor the obligation to change the label on another company's package. Plaintiff insists that Defendants owed her a warning. A169-170 ¶¶ 93-97. If a food package was mislabeled, however, that would be the responsibility of the company that made and sold the food, not the manufacturer of any HFCS (or flour or baking powder) contained therein. Plaintiff is seeking redress against the wrong parties; her complaint was properly dismissed.

## II.    Plaintiff's theory of causation is implausible.

A complaint must be dismissed where it lacks factual allegations plausibly showing that defendant's unlawful conduct, rather than some other cause, is responsible for plaintiff's injury. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Here, Plaintiff has failed to plausibly allege that

HFCS—as distinct from, and opposed to, a generally poor diet, other sugars (including fructose), family history, lack of exercise, etc.—is a substantial cause of her type 2 diabetes.  Generously read, the amended complaint made allegations that are "'merely consistent with' a defendant's liability," but that is not enough, as it "stops short of the line between possibility and plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*).

### A.   Given the numerous, well-known risk factors for diabetes, the assertion that consuming HFCS is the proximate cause of Plaintiff's diabetes is not plausible.

Type 2 diabetes is known to be associated with a wide variety of risk factors, such as age, obesity, physical activity, genetics (including family history of diabetes), family background in certain groups, and many other factors.[19]  These risk factors are themselves often multifactorial.  For example, obesity is the result of some combination of the type and amount of food eaten, level of physical activity, genetics, metabolism, and other factors.  *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 539 (S.D.N.Y. 2003).

---

[19] Nat'l Diabetes Information Clearinghouse, U.S. Dep't of Health & Human Services, *Causes of Diabetes*, http://diabetes.niddk.nih.gov/dm/pubs/causes/; Nat'l Diabetes Educ. Program, U.S. Dep't of Health & Human Services, *Diabetes Risk Factors*, http://ndep.nih.gov/am-i-at-risk/DiabetesRiskFactors.aspx; Am. Diabetes Ass'n, http://www.diabetes.org/diabetes-basics/genetics-of-diabetes.html.

HFCS is only one tiny part of only one of those factors—food.  And HFCS is not the sole source of sugars or fructose for any person.  Other sources include sucrose, honey, sugars found naturally in fruit, and so on.  And sugars are only one source of calories in food, in addition to other carbohydrates, protein, and fat.  It simply is not plausible to pretend that a single sweetener—which is just one type of sweetener among many sweeteners, which is just one type of food among many foods, which is just one among many potential causes of obesity, which is just one among many risk factors for diabetes—is uniquely responsible for Plaintiff's diabetes.

Plaintiff argues that Defendants have not shown there are any other causes of diabetes.  Br. 27-28.  But of course there are.  HFCS was first made in the 1960s (A155 ¶21); diabetes has been known since antiquity.  And while Plaintiff complains bitterly about the use of judicial "common sense" at the motion to dismiss stage (*e.g.*, Br. 11-12), that is not just permissible; it is required: "Determining whether a complaint states a plausible claim for relief … requires the reviewing court to draw on its judicial experience and common sense."  SPA7 (quoting *Iqbal*, 556 U.S. at 679).  There are millions of people in this country who eat food containing HFCS without becoming diabetic.  It is neither necessary nor proper to send this case through

lengthy and expensive discovery simply as groundwork for the district court's inevitable ruling on summary judgment that, yes, the sky is blue.

Indeed, the claims in this case suffer from the same shortcoming—an implausible theory of causation—that required dismissal in *Twombly*. There, the plaintiff alleged that telecommunication companies engaged in "parallel conduct" that allowed them to inflate telephone and internet charges. *Twombly*, 550 U.S. at 550. The "crucial question" was whether this parallel conduct was the result of an independent decision at each company (which would be unobjectionable), or the result of a conspiracy among the companies (which would be illegal). *Id.* at 553. Given those two possible alternative causes, the Supreme Court refused to assume that illegal conduct was the cause: "parallel conduct does not suggest conspiracy, and a *conclusory allegation* of agreement at some *unidentified point does not supply facts adequate* to show illegality." *Id.* at 557 (emphasis added).

By requiring factual allegations to show which alternative cause was responsible for the plaintiff's injury, the Supreme Court in *Twombly* was following and reinforcing its conclusion two years earlier in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). There, the plaintiff alleged that he bought stock at a price that was inflated because of false statements the

33

company made about its products. *Id.* at 338-39. But when the stock's price later fell, that may have "reflect[ed], not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 343. Given those other potential causes, the Supreme Court held that the complaint must be dismissed for failing the "simple test" of "pleading ... proximate causation." *Id.* at 346. So too here.

On appeal, without directly addressing the governing plausibility standard, Plaintiff endeavors principally to distinguish herself from *Pelman*—a case in which several New York teenagers blamed their obesity (and one blamed his diabetes) on foods consumed at McDonald's. Br. 15-16. As here, the *Pelman* plaintiffs failed to eliminate other variables for obesity such as "social behavioral, physiological, metabolic, cellular, … molecular" and "cultural and genetic factors." *Pelman*, 237 F. Supp. 2d at 539; *see also* 2003 WL 22052778, *11 (S.D.N.Y. Sept. 3, 2003) (dismissing amended complaint that still failed to address potential causal factors beyond diet). As Plaintiff points out (Br. 15), this court vacated and remanded, 396 F.3d 508 (2d Cir. 2005)—but she ignores that was in 2005, *before* the Supreme

34

Court's express adoption of a plausibility standard.  SPA8; *Lovell v. GEICO Gen. Ins. Co.*, 2013 WL 7871497, *5 (W.D.N.Y. Mar. 29, 2013).

> **B.    Plaintiff's claims are not rendered plausible by her "food history," her conclusory assertions of mislabeling, or the facially flawed opinion of an "expert" acting as advocate, not physician.**

Plaintiff's original complaint had nothing to say about any risk factors beyond her age, alleging only that she ate some unidentified amount of HFCS in some unidentified foods at some unidentified time and ended up diabetic.  The amended complaint added:  (1) one sentence listing some foods Plaintiff ate, based on an affidavit from her mother (A167 ¶87; A291-92 ¶¶ 3, 5)—what Dr. Lustig calls her "food history" (A212 ¶50); (2) various references to HFCS 90 and Crystalline Fructose—including that Plaintiff consumed them but cannot say in which food products or in what amounts; and (3) an affidavit from Dr. Lustig stating that he stood ready to declare "with reasonable medical and scientific certainty" that HFCS was a significant factor in causing Plaintiff's type 2 diabetes (A212 ¶50).[20]

---

[20] Plaintiff also attached to her amended complaint various documents underscoring that sucrose and HFCS are nutritionally equivalent, and that excessive consumption of sugars is unhealthy.  For obvious reasons, these do not advance her theory of causation; if anything, they undermine it.

35

This is not enough to plead either *general* causation (whether this type of injury can be caused by the product) or *specific* causation (whether Plaintiff's *own* injury actually was caused by the product)—*both* of which are required in a product liability case.  *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 250 n.1 (2d Cir. 2005); *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 575 (S.D.N.Y. 2006).

### 1.  The foods Plaintiff ate

Plaintiff's mother provided a list of foods that Plaintiff ate and her mother "recently learned contain HFCS."  A291-293 ¶¶ 3, 5.  On its face, however, this list purports to address only one type of sweetener among many sweeteners, which is just one type of food among many foods, which is just one among many potential causes of obesity, which is just one among many risk factors for diabetes.  HFCS-sweetened foods alone are far too small a piece of the causal puzzle to show the entire picture.

In addition, while S.F. stated that she "recently" learned these foods contain HFCS, the fact is about half of them contain *no HFCS at all*.  Many of them do, however, contain corn syrup (pure glucose and no fructose), sugar (like HFCS, a source of fructose), and similar ingredients (A350-

36

353)—thus further undercutting the implausible notion that HFCS alone is to blame for Plaintiff's diabetes.

Setting aside the HFCS-free foods, this is what remains:  one brand of ketchup; three types of canned pasta; cookies; one bread; sodas; and certain varieties of ice creams, jams, Chicken McNugget sauces, and restaurant hamburger buns.  That's it.  Plaintiff's allegations do not support the assertion that her diet "consist[ed] in significant part of HFCS."  Br. 15.  It simply is not plausible that she ate so great a quantity of these few random items such as ketchup that they, rather than the many other known causal factors or her admittedly "poor diet" as a whole (*id.*), caused her diabetes.

### 2.    HFCS 90 and Crystalline Fructose

Equally outlandish is Plaintiff's contention that "almost all processed foods" secretly use HFCS 65 (which does not exist), HFCS 90, and Crystalline Fructose.  Br. 20, 22; A159, 162-163 ¶¶ 48, 61, 66-70.  Even if Plaintiff honestly believes that a vast number of American companies systematically and willfully mislabel products and lie to consumers (violating any number of state and federal laws in the process), she offers in support *no* well-pleaded facts whatsoever.  Conclusions "are not entitled to the assumption of truth," and Rule 8 "does not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678.[21]

A further problem is that Plaintiff admits "there was and is no way for the Plaintiff" to know if she ate those products. A163 ¶70. Dr. Lustig agrees, on the ground that "the extent to which HFCS 65 HFCS 90 and Crystalline Fructose are in foods" is "not known." A209 ¶35. And her mother agrees, asserting that the HFCS that Plaintiff consumed came in "unknown concentrations." A292 ¶5. If no one knows whether Plaintiff ever consumed HFCS 65 (she has not, because it does not exist) or HFCS 90 or Crystalline Fructose, she cannot plausibly plead that they injured her.

Indeed, it is impossible for this case to go forward based only on higher fructose formulations. Even if, contrary to reality, Plaintiff could prove that HFCS (not all other sweeteners, foods, and all other risk factors for diabetes) made her diabetic, she could never show that only the less common sweeteners HFCS 90 and Crystalline Fructose, rather than the far more common sweeteners HFCS 42 and 55, were the cause.

---

[21] Plaintiff says the supposedly widespread use of HFCS 90 and Crystalline Fructose is shown by a document taken from the corn.org website. Br. 20 (citing A298-99). But this document lists *types* of food—not specific products—in which HFCS or Crystalline Fructose *can* be used. It is frivolous to characterize this, as Plaintiff does, as some kind of admission that HFCS and Crystalline Fructose *are* used "in almost all processed foods." *Id.*

### 3.    Dr. Lustig

Dr. Lustig asserts that after "review[ing] all of the extant medical records for the infant," and "the Affidavit of the child's mother, S.F. which attests to many of the foods that the infant consumed ... that contained HFCS," he is ready to declare "with reasonable medical and scientific certainty" that HFCS was a significant cause of Plaintiff's diabetes.  A204 ¶6; A212 ¶50.  That is exactly the sort of grandstanding and speculation that has earned Dr. Lustig his notoriety and book sales.  But it cannot establish a plausible claim in a court of law.

To start, Dr. Lustig never claims to have examined or even met Plaintiff; he does not disclose what medical records are "extant" or what they say; he treats the paltry list of foods provided by S.F. as Plaintiff's "food history"; and he explicitly takes at face value S.F.'s misidentification of a large number of foods as containing HFCS when they don't.  Take Chicken McNuggets, for example.  In the affidavit that Dr. Lustig reviewed, Plaintiff's mother states, "I did not perceive nor know that the chicken product itself [McNuggets] might have contained HFCS."  A293-294 ¶8.  But Dr. Lustig knows there is no HFCS in Chicken McNuggets; he posted on the internet a video of himself saying so.  *Sugar: The Bitter Truth*, *supra*, at

39

1:16:48.  Dr. Lustig's drive-by, paper "diagnosis" cannot render plausible the proposition that it was HFCS that caused Plaintiff's diabetes.

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (quoted at SPA7).  That is what the district court did here when it observed that "Type 2 diabetes is a multifactorial disease.  It can be caused by, for example, a lack of exercise, genetics, or poor diet—or some combination of several factors.  No expert opinion is required to arrive at this conclusion."  SPA7.

Plaintiff now castigates the district court for taking sides against her in a scientific debate.  Br. 11-12, 14.  But the court did no such thing.  After summarizing various uncontested facts, it observed that the "hotly debated health effects of sugar and high-fructose corn syrup" is "largely immaterial … because facts alleged in Plaintiff's complaint (though not labels or legal conclusions) must be accepted as true."  SPA3-4.[22]

---

[22] It is thus most unfair, and inappropriate, for Plaintiff to accuse the district court of bias and committing "egregious errors" in order to reach a "preordained conclusion" that type 2 diabetes is a multifactorial disease.  Br. 11-12.  According to Plaintiff, the district court's "self-justifying conclusion … is ridiculous, and frankly, a bit embarrassing."  Br. 14.

The problem remains that, "even accepting the allegations in the complaint as true, there is little in it to suggest that Plaintiff could prove that *her* consumption of some foods containing HFCS over the course of her life was a substantial factor in causing Type 2 diabetes."  SPA4, 7.  "[A]side from idly listing various common foods she has eaten, Plaintiff offers limited facts that might lead this Court to believe that she could ultimately show it was her consumption of these foods, and specifically the HFCS found within these foods (manufactured by these defendants) that lead to her disease."  SPA7.  In other words, the complaint fails even if the fringe position staked out by Plaintiff and Dr. Lustig on the health effects of fructose is taken at face value.

What is more, that position should *not* be taken at face value.  Dr. Lustig may be "nationally recognized" (Br. 12), but his opinions with respect to HFCS are contrary to federal law—and implausible as such.  As discussed further below, FDA has determined in no uncertain terms that HFCS is safe and may be used in foods *without limitation*.  *Infra*, 57-62.  By definition, this determination "means that there is a *reasonable certainty* in the minds of *competent scientists* that the substance is *not harmful* under the intended conditions of use."  21 C.F.R. §170.3(i) (emphasis added).  Accord-

41

ingly, Dr. Lustig's extraordinary opinions cannot turn this implausible claim into a plausible one.

If anything, Dr. Lustig's opinions make matters worse for Plaintiff. For example, while Plaintiff must contend that HFCS contributes uniquely to type 2 diabetes, Dr. Lustig has taken the position—repeatedly and publicly—that "HFCS and sucrose are, for all intents and purposes, biochemically and metabolically equivalent." FAT CHANCE at 166; *see also infra*, 49. He also claims that he can "cure diabetes on a dime.  Takes about a week." *Sugar: The Bitter Truth*, *supra*, at 75:00.  If he is right, Dr. Lustig has discovered a miracle cure for the many millions of people that suffer today from diabetes, putting an end to the disease (and this litigation).  If he is wrong, he has no place as a diabetes "expert" and there is no reason for this Court to credit his affidavit as a reason to sustain an implausible complaint.

In sum, Plaintiff's proposed amended complaint actually managed to make her weak claims weaker.  With that pleading, she established only that she consumed some minor amount of HFCS at some unidentified time, and as much (or more) of other sugars.  She offered nothing about the quantity of such foods (and HFCS) she ate, the other sweeteners she ate (aside from those present in the foods her mother identified), the other

foods she ate, or the many other risk factors for diabetes. Where "well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct, the complaint has alleged—but it has not *shown*—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (emphasis added). That is the case here. The judgment should be affirmed.

## III. Food products are not "unreasonably dangerous" simply because excessive consumption may be unhealthy.

Plaintiff's theory is that "[f]ructose is a major cause of metabolic syndrome and type 2 diabetes" (A159 ¶ 52), and, moreover, that it was specifically the fructose *in HFCS* that caused her diabetes (A156-57 ¶¶ 28, 34, 36; A212 ¶50). Even if this were a plausible theory of causation (it is not, as just discussed), fructose cannot be "unreasonably dangerous" on the theory that it may have ill effects if consumed in excessive amounts. *A fortiori*, the fructose in HFCS cannot render that product defective.

### A. The district court correctly ruled that Plaintiff has not plausibly pleaded that HFCS is unreasonably dangerous.

Fundamental principles of tort law prevent a plaintiff from asserting claims based on her own choice to eat too much food:

> Many products cannot possibly be made entirely safe for all consumption, and any food ... necessarily involves some risk of harm, if only from overconsumption. Ordinary sugar is a dead-

43

ly poison to diabetics ....  That is not what is meant by 'unrea-
sonably dangerous.'...  Good butter is not unreasonably dan-
gerous merely because, if such be the case, it deposits choles-
terol in the arteries and leads to heart attacks; but bad butter,
contaminated with poisonous fish oil, is unreasonably danger-
ous.

RESTATEMENT (SECOND) OF TORTS §402A cmt. i; *see also Gorran v. Atkins Nu-*
*tritionals, Inc.*, 464 F. Supp. 2d 315, 324 (S.D.N.Y. 2006) (increasing the risk
of disease does not make food defective); *Pelman*, 237 F. Supp. 2d at 532 (no
one needs to be warned against over-consumption in order for a product's
makers to avoid tort liability); *accord* RESTATEMENT (THIRD) TORTS: PROD.
LIAB. §2 cmt. j; *Cook v. MillerCoors, LLC*, 872 F. Supp. 2d 1346, 1350-51 (M.D.
Fla. 2012); *Pinello,* 2011 WL 1302223, at *11.

Plaintiff does not allege that she ate *contaminated* HFCS.  Instead, she
contends that eating fructose in the form of HFCS over time led to diabe-
tes — the very claim that is out of bounds.  As the district court emphasized:

[Plaintiff] does not distinguish between fructose found in fruit
and fructose found in HFCS; rather, she alleges that
"[f]ructose" — *not high-fructose corn syrup* — "is a major cause of
metabolic syndrome and type 2 diabetes."  The studies attached
to Plaintiff's amended complaint, on which she relies in bring-
ing this claim, naturally arrive at the same conclusion: it is the
overconsumption of fructose that may lead to increased obesity
and other adverse health effects.

SPA13 (internal citation omitted) (quoting A159 ¶52 and referencing stud-

ies at A139-50).  Plaintiff reaffirms this position on appeal:  the problem, she asserts, is the *fructose*.  Br. 17 ("the active ingredient, fructose, is a substance that has been shown by peer reviewed research to be a cause of metabolic disease and type 2 diabetes"); Br. 20 ("[A]n obvious issue is the quantity of fructose consumed ….").

But if fructose is the problem, then nothing meaningful distinguishes HFCS from sucrose, honey, any other sweetener containing fructose, or the fructose that is found naturally in so many foods.

### B.     The district court's ruling turns on neither the terminology in Plaintiff's complaint, nor the proposition that sucrose and HFCS are nutritionally equivalent.

Challenging this ruling on appeal, Plaintiff contends the district court took the "strident (and incorrect legal) position that the Complaint must be dismissed because it pleads only that the product was 'not reasonably safe' as opposed to 'unreasonably dangerous.'"  Br. 17 (citing SPA12-14).  But Plaintiff misunderstands the district court's ruling.  The court did not fault Plaintiff for semantics ("not reasonably safe" versus "unreasonably dangerous"), as Plaintiff suggests.  The court rejected her claims because, "[i]f there is no difference between HFCS and simple fructose, HFCS can hardly be said to be unreasonably dangerous."  SPA13.

Elsewhere in her appellate brief, Plaintiff argues that the district court erred by finding "that there is no difference between [*sugar and HFCS*] as a matter of law."  Br. 4 (emphasis added); *see also* Br. 8-10 (calling this supposed conclusion "simplistically naïve" and arguing that sucrose and HFCS are different).  But this too misunderstands the district court's decision.  The district court's reference to "fructose" was not a typographical error.  Rather, as just discussed, the court ruled that Plaintiff's claims fail because there is no difference between the *fructose* in other sugars and the *fructose* in HFCS—and it reached that conclusion based on the allegations in Plaintiff's own complaint.

It thus makes no difference whether sucrose and HFCS are equivalents—though they are, as food package nutrition fact panels show.  The following is a sample from FDA's website:

46

**Nutrition Facts**

Serving Size 1 cup (228g)
Servings Per Container about 2

**Amount Per Serving**

| **Calories** 250 | Calories from Fat 110 |
|---|---|

| | % Daily Value* |
|---|---|
| **Total Fat** 12g | **18%** |
| Saturated Fat 3g | **15%** |
| *Trans* Fat 3g | |
| **Cholesterol** 30mg | **10%** |
| **Sodium** 470mg | **20%** |
| **Total Carbohydrate** 31g | **10%** |
| Dietary Fiber 0g | **0%** |
| Sugars 5g | |
| **Proteins** 5g | |

| Vitamin A | 4% |
|---|---|
| Vitamin C | 2% |
| Calcium | 20% |
| Iron | 4% |

* Percent Daily Values are based on a 2,000 calorie diet.
Your Daily Values may be higher or lower depending on
your calorie needs:

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less than | 65g | 80g |
| Saturated Fat | Less than | 20g | 75g |
| Cholesterol | Less than | 300mg | 300mg |
| Sodium | Less than | 2,400mg | 2,400mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

These familiar panels require the seller to report the total grams of sugars (in the image above, "Sugars 5g"), which is "defined as the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose)." 21 C.F.R. §101.9(c)(6)(ii). FDA does not treat HFCS any differently than sucrose or honey on food package nutrition facts panels; on the contrary, FDA *requires* HFCS to be included among the "Sugars." All HFCS, sucrose,

honey, sugars occurring naturally in fruit, and other calorie-bearing sweeteners are counted together to show the product's total sugars content.[23]

Plaintiff accuses Defendants of having asserted differences between HFCS and sucrose in briefing and expert reports from a different case in 1997. Br. 8-9. The charge is false. The 1997 case was an anti-dumping dispute under the Mexican Foreign Trade Act. The briefing and expert reports discussed things such as physical differences between HFCS (a liquid) and sugar (a solid). In no way do they contradict the only important point here—that the fructose in HFCS and the fructose in sugar have the exact same effect when digested; they are nutritional equals.

Indeed, before he got involved in this lawsuit, Dr. Lustig told anyone who would listen the same thing—that HFCS and sugar are *identical* from the body's perspective:

---

[23] When adopting this regulation in 1993, FDA specifically rejected proposals for food labels to distinguish between naturally occurring sugars and sugars added to food: "The Agency is not persuaded that there is a need for mandatory disclosure of added sugars in place of, or in addition to, total sugars. There is no scientific evidence that the body makes any physiological distinction between added sugar molecules and those naturally occurring in food." Food Labeling: Mandatory Status of Nutrition Labeling and Nutrient Content Revision, Format for Nutrition Label, 58 Fed. Reg. 2,079-01, 2,098 (Jan. 6, 1993).

- "HFCS and sucrose are, for all intents and purposes, biochemically and metabolically equivalent." Fᴀᴛ Cʜᴀɴᴄᴇ at 166.

- "HFCS is no worse for your health than any other forms of fructose ...." *Id*. at 169.

- "[I]f all the HFCS-contained candy bars in the world somehow mysteriously were replaced by their sucrose-containing equivalents, ... your body wouldn't know the difference ...." *Id*. at 178.

- "High fructose corn syrup.  Sucrose.  It's a non-issue.  It's a wash. They're the same ...." *Sugar: The Bitter Truth*, *supra*, at 18:52

- "[F]ructose, and I don't care what the vehicle is, it's irrelevant, sucrose or high fructose corn syrup, I don't care." *Id*. at 1:26:01.

- "All the data says that high fructose corn syrup and sucrose, table sugar, cane sugar, beet sugar, the stuff you put in coffee, are exactly the same.  ...  And in fact it [HFCS] does exactly what the natural sugar does, too." *The Colbert Report*, *supra*, at 3:35, 4:04.

It is too late now for Dr. Lustig (or anyone else) to pretend that sugar, honey, and fruit have good fructose but HFCS has bad fructose.  Plaintiff's complaint asserts without elaboration that there are "clear differences in how the human body processes" "HFCS and sugar."  A161 ¶60.  Dr. Lustig adds that the "dietary fructose from HFCS is metabolized differently from sugar (sucrose)."  A209 ¶35.  Neither of these, however, says that the *fructose* in sugar and the *fructose* in HFCS are metabolized differently.  Given Plaintiff's other allegations and the studies attached to her complaint, it is clear that she has not (and could not) plausibly take the position that the

human body cares about the source of the fructose molecules it ingests. Fructose is fructose, and if Plaintiff ate too much of foods containing it or other sugars, Defendants are not liable.

Plaintiff may respond that HFCS has a *higher concentration* of fructose than sugar—which is true of some, though not all, kinds of HFCS.  But so does an apple.  A 100 gram apple contains 5.9 grams of fructose, 2.4 grams of glucose, and 2.1 grams of sucrose (which is half fructose and half glucose).[24]  The fructose-to-glucose ratio of an apple, then, is 2-1.  That is much higher than the fructose concentration of HFCS 42 or 55.[25]

Further, to someone like Plaintiff focused on fructose consumption, the ratio alone should not even matter.  What should matter is the *total amount* of fructose.  Focusing on concentrations alone would lead one to

---

[24] These figures, and those discussed below for dried figs, come from the U.S. Department of Agriculture's National Nutrient Database for Standard Reference, http://ndb.nal.usda.gov/.

[25] This proves false Plaintiff's unsupported assertions that fructose "occurs in nature[] always in equal (50/50%) percentages with glucose" and "is only available at different concentrations and much higher doses in HFCS." Br. 11, 18.  Plaintiff is also mistaken when she says that HFCS's "concentration is invariably higher [than 50/50%], at an admitted percentage of 55%." *Id.* at 21.  Plaintiff inexplicably ignores HFCS 42, which is commonly used in foods and beverages in the United States and contains *less* fructose than sugar and honey.

think that eating 100 grams of apple is better than eating 100 grams of dried fig, because the dried fig has a fructose-to-glucose ratio of just under 1 (slightly less fructose than glucose). Yet the dried fig contains over three times as much total fructose, 22.9 grams compared to 6.95 grams in the apple. Fructose concentration, in other words, has little to do with how much fructose is in any food. And the amount of fructose that is included in a food product is determined by the food manufacturer, not by Defendants.

More fundamentally, the amount of fructose that Plaintiff consumed is her (and her mother's) responsibility. Plaintiff has not and cannot show that the fructose in HFCS presented some unknown danger beyond the fructose in sugar and other sugars.

## IV.   Plaintiff may not rely on a theory of market share liability.

A plaintiff may not make undifferentiated allegations against defendants as a group without identifying any wrongdoing on the part of any defendant in particular. "A complaint based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *see also In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 214 (5th Cir. 2010) (to same effect); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 366 (S.D.N.Y. 2009) (because "the plaintiff bears the burden

51

of showing that the defendant was the manufacturer of the product at issue," it is insufficient to "implicate[] a class of products, but no one product in particular") (New York law).

Plaintiff disputes neither this rule nor that her complaint violates it. Rather, she asks to proceed under an exception: the doctrine of market share liability under *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (1989). But there is no basis for applying that doctrine here.

In *Hymowitz*, a case involving an unusual cancer caused by the drug DES, the court recognized that "identification of the exact defendant whose product injured the plaintiff is, of course, generally required." *Id.* at 504. But given that DES was made by "a great number of possible wrongdoers," and given that pharmacies filled prescriptions with whatever pills they had on hand, it was "impossible" for any plaintiff to identify the relevant DES manufacturer(s). *Id.* at 502-06. Further, the New York legislature had passed a special law reviving old DES claims. The court thus "stress[ed] ... that the DES situation is a singular case." *Id.* at 508.

And indeed, "[o]utside the DES context, market share liability has been sparingly adopted." *In re New York Silicone Breast Implant Litig.*, 631 N.Y.S.2d 491, 493 (Sup. Ct. 1995), *aff'd* 234 A.D.2d 28 (N.Y. App. Div.). New

York courts have "refused to extend the market share theory beyond cases involving DES," *Brenner*, 263 A.D.2d at 171, including in cases about silicone implants, cigarettes, guns, and lead. *In re New York Silicone Breast Implant Litig.*, 631 N.Y.S.2d at 494; *DaSilva v. Am. Tobacco Co.*, 175 Misc.2d 424, 427 (N.Y. Sup. Ct. 1997); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 240-41 (2001); *Brenner*, 263 A.D.2d at 171.

Here, too, the situation is fundamentally different from *Hymowitz*, starting with the fact that the legislature has not taken special action to favor HFCS lawsuits or otherwise suggested any overriding public interest in allowing these types of claims to proceed. SPA10-11 (citing *Brenner*, 263 A.D.2d at 173). On the contrary, the legislature has consistently declined to pass a proposed anti-HFCS bill. N.Y. Assembly Bill 2865, 2013 Legislature. And while Plaintiff complains that the district court made "a significant reach" in "extrapolat[ing]" that legislative action is necessary to support use of market share liability (Br. 25-26), it is not the district court that imposed this factor; it is New York law. *Brenner*, 263 A.D.2d at 173.

Nor can Plaintiff justify the use of market share liability under the other factors that New York courts consider, as set forth in Section 15(c) of the RESTATEMENT (THIRD) OF TORTS, PRODUCT LIABILITY:

53

1.    *The generic nature of the product.*  Plaintiff says that HFCS is a fungible commodity.  Even if that were true, the food products that she ate are not.  In a case involving lead paint, the New York Appellate Division determined that the relevant product was not the allegedly dangerous lead ingredient, but rather the paint sold to consumers.  *Brenner*, 263 A.D.2d at 172.  And on that basis—*i.e.*, because "the finished product that was used by consumers here … was not fungible"—the court ruled that market share liability could not apply.  *Id.*  This case is indistinguishable.

A related problem is that the finished products here are not only non-fungible; they are also identifiable products with name brands, as the affidavit of Plaintiff's mother shows.  *See DaSilva*, 175 Misc.2d at 427 (rejecting market share liability where plaintiffs could identify brands).

2.    *The inability of plaintiffs to discover which defendant's conduct caused plaintiff's harm, even after exhaustive discovery.*  While her amended complaint asserts that "there is no way to identify which processed foods contained which HFCS is manufactured by which Defendant" (A155 ¶20), that is implausible on its face.  If a food company purchased HFCS to use in ketchup, for example, the company or the seller would presumably know about the sale.  Given that Plaintiff must show (among many other things)

what foods that she ate contained HFCS, she cannot claim that its origins are impossible to determine.

3. *The long latency period of the harm.* The complaint alleges nothing about when Plaintiff ate specific foods containing HFCS, but it does allege that she was 12 years old when she developed type 2 diabetes. A long latency period, that is not. *Compare* SPA11 (the manifestations of Plaintiff's injury were not "far removed from the time of ingestion of the product"), *with Hymowitz*, 73 N.Y.2d at 502-503 (discussing generally the long latency period before the effects of DES were manifest in the daughters of women who took the drug during pregnancy); *Sindell v. Abbott Labs.*, 26 Cal.3d 588, 594 (1980) ("The form of cancer from which these daughters suffer … manifests itself after a minimum latent period of 10 or 12 years.").

4. *The clarity of the causal connection between the defective product and the harm suffered by plaintiffs.* The causal connection here is unclear, to say the least. *Supra*, 30-43.

5. *The absence of other factors that could have materially contributed to the harm.* Related to that last, in *Hymowitz*, the plaintiffs all developed the same uncommon cancer—a "signature injury." *Brenner*, 263 A.D.2d at 172. But diabetes is not a signature injury of HFCS. SPA11 (citing *Brenner*); *see*

*also Giles v. A. Gi Yi*, 105 A.D.3d 1313, 1318 (N.Y. App. Div. 2013) (dismissing complaint, because, *inter alia*, the injuries alleged "could have been caused by some source other than lead"). Plaintiff disagrees (Br. 27), but type 2 diabetes long predates the first production of HFCS. It simply is not a "signature injury" in the same sense as the specific cancer associated with DES—an injury associated with DES and *nothing else*.

Nor, moreover, do Defendants have exclusive control of any risk posed by HFCS. SPA11-12. For this reason too, as the district court explained, the lead paint precedent, *Brenner*, is indistinguishable: "There is no dispute that the makers of the end-products—not the defendants—decide 'what quantities' of HFCS to use, just as the manufacturers of the paint—and not the manufacturers of the lead—decided how much lead to use." SPA12; *see Brenner*, 263 A.D.2d at 172.

6.   *The availability of sufficient market share data.* HFCS is only one of many sources of fructose; the others include sugar and honey and products containing them, as well as many different kinds of fruits and vegetables. But Plaintiff made no allegations to support the idea that the fructose market could be accurately divided.

In short, the district court properly refused to extend the doctrine of market share liability in dismissing Plaintiff's complaint.

## V.   Federal law preempts Plaintiff's claims.

Finally, the judgment should be affirmed on the ground that Plaintiff's claims are preempted by federal law.  Under the Supremacy Clause, federal laws preempt conflicting state laws.  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  A conflict may arise either because it is not possible to comply with both federal and state requirements or because the state requirements are an obstacle to federal law achieving its full purposes.  *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013).

Here, there are two conflicts:  First, the premise of this lawsuit is that "HFCS is a toxin."  A16 ¶40 (original complaint).  According to FDA, however, HFCS is "safe."  Second, the fructose and fructose concentrations to which Plaintiff objects as a matter of state law are required by federal law.

### A.   Federal law affirms that HFCS is safe.

As she put it in her original complaint, Plaintiff's claim is that HFCS is a "toxin" under New York law that is "unreasonably dangerous ... even when used in its intended manner," *i.e.*, as an ingredient in food to be eaten.  A16, 20 ¶¶ 40, 58.  Under federal law, however, HFCS was "reviewed

57

by the Food and Drug Administration and determined to be generally recognized as safe (GRAS)."   21 C.F.R. §184.1(a).   This GRAS determination specifically authorizes the use of HFCS 42 and 55 as an "ingredient ... in food *with no limitation* other than current good manufacturing practice."   21 C.F.R. §184.1866(c) (emphasis added).

This means that Plaintiff's claims are preempted.   A food ingredient cannot be "safe" under federal law but "toxic" under state law.   *See, e.g.*, *Simpson v. Calif. Pizza Kitchen*, 2013 WL 5718479, *9 (S.D. Cal. Oct. 1, 2013) ("By definition, something that is 'generally regarded as safe' cannot at the same time be 'not safe for human consumption.'") (granting motion to dismiss).   This is not just common sense.   When used in connection with food, by definition,"[s]afe ... means that there is a *reasonable certainty* in the minds of *competent scientists* that the substance is *not harmful under the intended conditions of use*."   21 C.F.R. §170.3(i) (emphasis added).

Determining whether food is safe is uniquely within FDA's expertise: "FDA ... knows how to weigh conflicting studies and determine the most accurate and up-to-date information regarding product safety.   Although courts can resolve whether a product has been approved as safe, the question of whether a product should be approved as safe requires the FDA's

expertise." *Aaronson v. Vital Pharm., Inc.*, 2010 WL 625337, *2-3 (S.D. Cal. Feb. 17, 2010) (internal citation omitted) (deferring to "FDA's unique ability to discern scientific data and ensure uniform regulation in the field").

FDA's Final Rule on HFCS explains that the agency "fully evaluated" HFCS and determined that it is safe in food. 61 Fed. Reg. at 43,447. The process began in 1988, when FDA proposed to affirm that HFCS is GRAS. *Id.* Its proposal included (1) the agency's evaluation of data in petitions previously submitted about HFCS, (2) discussion of reports by a GRAS committee, and (3) discussion of a report by FDA's Sugars Task Force. *Id.* It assessed both HFCS 55 and HFCS 42. *Id.* at 43,447-48, 43,449. And, after examining the "probable consumption of the substance," the "cumulative effect of the substance in the diet," and "[s]afety factors" (21 C.F.R. §§ 170.3(i)(1), (2), (3)), FDA ruled HFCS safe.

What is more, *FDA specifically rejected assertions that HFCS plays a special role in diabetes*. 61 Fed. Reg. at 43,448. One of the comments that FDA received on its proposed rule was from the Diabetes Research Center. *Id.* at 43448. The Center "stated its opinion that the safety of HFCS as it relates to diabetics has not been totally established. It suggested that th[is] fact ... should be stated somewhere on the product label." *Id.* The Center's sug-

gestion bears a striking resemblance to Plaintiff's failure to warn claim.

FDA emphatically said no: "FDA's Sugars Task Force stated in its report ... that it *could not find any basis in the scientific literature to conclude that there was the potential for an adverse effect in diabetics from increased fructose consumption*." *Id.* (emphasis added). FDA also noted that the American Diabetes Association's Nutrition Principles for the Management of Diabetes and Related Complications "do not include a recommendation to avoid any specific sweetener because of safety concerns." *Id.* FDA concluded "that there is no evidence to suggest that HFCS is any less safe for diabetics than any other commonly used sweetener." *Id.* Finally, when assessing the impact of the rule, FDA found "*there will be no increase in the health risks faced by consumers resulting from this final rule*." *Id.* at 43,450 (emphasis added).

In district court briefing, Plaintiff argued that the GRAS designation is from the 1980s and therefore too old to be based on credible science. A312. But it was in 1996—not the 1980s—that FDA concluded its eight-year review and affirmed HFCS as GRAS. 21 C.F.R. §§ 184.1(a), 184.1866; 61 Fed. Reg. 43,447-01 at 43,447.

Furthermore, even today, FDA *still* is "not aware of any evidence" that HFCS is any different in safety than sugar and honey. Here is FDA's

60

current statement on the subject:

**Is HFCS less safe than other sweeteners?**

FDA receives many inquiries asking about the safety of HFCS, often referring to studies about how humans metabolize fructose or fructose-containing sweeteners. These studies are based on the observation that there are some differences between how we metabolize fructose and other simple sugars.

*We are not aware of any evidence, including the studies mentioned above, that there is a difference in safety between foods containing HFCS 42 or HFCS 55 and foods containing similar amounts of other nutritive sweeteners with approximately equal glucose and fructose content, such as sucrose, honey, or other traditional sweeteners.* The 2010 Dietary Guidelines for Americans recommend that everyone limit consumption of all added sugars, including HFCS and sucrose. FDA participated in the development of the Dietary Guidelines and fully supports this recommendation.

*See HFCS: Q&A* (emphasis added).

In sum, the notion that FDA accorded the GRAS designation to HFCS based on "undocumented assumptions" (Br. 11) is false. And if the matter needs reconsideration, respectfully, that is FDA's bailiwick, not this Court's. *Cardinale v. Quorn Foods*, 2011 WL 2418628, *6 (Conn. Super. Ct. May 19, 2011) ("This court is not the FDA" and cannot "revoke ... GRAS status."). Federal law declares that qualified scientists have found HFCS to be safe, that it is no different in safety than table sugar or honey, and that it poses no special risk even to people who are already diabetic. Accordingly,

neither the design nor use of HFCS can be the basis for liability under state law.

## B.    Federal law mandates the design of HFCS.

Federal law requires HFCS 42 or 55 to be a "saccharide mixture containing either approximately 42 or 55 percent fructose, ... prepared as a clear aqueous solution from high dextrose-equivalent corn starch hydrolysate by partial enzymatic conversion of glucose (dextrose) to fructose using an insoluble glucose isomerase enzyme preparation ...."    21 C.F.R. §184.1866(a).

Federal law also requires HFCS 42 or 55 to "conform to the identity and specifications listed in the monograph entitled 'High-Fructose Corn Syrup' in the Food Chemicals Codex, 4th ed. (1996), pp. 191-192 ...."    *Id.* §184.1866(b); *see also id.* §170.30(h)(1).  The Codex gives the same description of HFCS as the federal regulation, and likewise requires "42% HFCS" to have "[n]ot less than 97.0% total saccharides, expressed as percent of solids, of which not less than 42.0% consists of fructose ...."  Codex at 191 (in the record at A61).  The Codex gives similar requirements for "55% HFCS," including that "not less than 55.0% consists of fructose ...."  *Id.*

Plaintiff contends that these levels of fructose make HFCS defective, but federal law *requires* that HFCS 42 and HFCS 55 contain them. As the Supreme Court recently reaffirmed in *Bartlett*, a manufacturer cannot be liable under state law for following federal requirements. In *Bartlett*, the plaintiff asserted a state-law design defect claim against a company that made a generic drug. But the company "was unable to change [the drug's] composition as a matter of ... federal law," nor could it unilaterally modify its warning label. 133 S. Ct. at 2470, 2471, 2475. It being impossible for the company to comply with both state and federal law, the Supreme Court held that the state law design defect claim was preempted. *Id.* [26]

Plaintiff has argued that the Codex requires "not less than" 42 or 55% fructose and that Defendants were thus free to use as much fructose as they desired. A315. But FDA's regulation plainly requires otherwise. 21 C.F.R. §§ 184.1866(a), (c) (requiring "approximately 42 or 55 percent fructose," subject only to the variations of "current good manufacturing practice"). The Codex is not suggesting manufacturers can *ignore* the regulation and

---

[26] Plaintiff has not made the argument, but *Bartlett* also rejected the facile notion that "compliance" with both sets of obligations is "possible" because a manufacturer could always pull its federally approved product off the market entirely. *See* 133 S. Ct. at 2473.

include as much fructose as they'd like; rather, the Codex tracks the regulation in allowing for minor variations due to manufacturing conditions.

Further, and in any event, Plaintiff does not claim that HFCS ought to contain *more* fructose—so even if federal law allowed that, it would not resolve the conflict.  In this regard, Plaintiff may argue that HFCS 90 and Crystalline Fructose are not subject to a federally mandated design.  As discussed above, however, Plaintiff's own complaint admits that "there was and is no way" to know if she ever ate those products, much less if they caused her any injury.  A163 ¶70.

In district court briefing, Plaintiff also endeavored to distinguish *Bartlett* on the ground that the drug there at issue went through a lengthy approval process.  But this actually *supports* Defendants' argument:  HFCS 42 and 55 both went through their own *eight-year* approval process to be affirmed as "Generally Recognized as Safe."  In any event, the length of the approval process has little bearing on preemption.  What matters is that, at the end of the day, federal law requires manufacturers to adhere to a particular design.  Where such is the case—as in *Bartlett*, as here—a state law claim challenging that design is preempted.

## CONCLUSION

For these reasons, the judgment should be affirmed.

Dated:  August 1, 2014                    Respectfully submitted,

                                          s/Stephen V. D'Amore
                                          DAN K. WEBB
                                          STEPHEN V. D'AMORE
                                          SCOTT P. GLAUBERMAN
                                          CORNELIUS M. MURPHY
                                          WILLIAM P. FERRANTI
                                          *Winston & Strawn LLP*
                                          *35 West Wacker Drive*
                                          *Chicago, IL  60601*
                                          *(312) 558-5600*
                                          *sdamore@winston.com*

                                          *Counsel for Defendants-Appellees*
                                          *Archer Daniels Midland Company,*
                                          *Cargill, Inc., Ingredion Incorporated,*
                                          *Tate & Lyle Ingredients Americas,*
                                          *LLC*

65

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,909 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Book Antiqua, a proportionally spaced typeface, using Microsoft Word 2010.

Dated:  August 1, 2014                    s/Stephen V. D'Amore
                                          STEPHEN V. D'AMORE
                                          *Winston & Strawn LLP*
                                          *35 West Wacker Drive*
                                          *Chicago, IL  60601*
                                          *(312) 558-5600*
                                          *sdamore@winston.com*

                                          *Counsel for Defendants-Appellees*
                                          *Archer Daniels Midland Company,*
                                          *Cargill, Inc., Ingredion Incorporated,*
                                          *Tate & Lyle Ingredients Americas,*
                                          *LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the  Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on August 1, 2014.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  August 1, 2014

s/Stephen V. D'Amore
STEPHEN V. D'AMORE
*Winston & Strawn LLP*
*35 West Wacker Drive*
*Chicago, IL  60601*
*(312) 558-5600*
*sdamore@winston.com*

*Counsel for Defendants-Appellees*
*Archer Daniels Midland Company,*
*Cargill, Inc., Ingredion Incorporated,*
*Tate & Lyle Ingredients Americas,*
*LLC*